S. B. PAYNE v. THE CHICAGO & NORTHWESTERN RAILWAY COMPANY, Appellant.

**Crossing Accident:** NEGLIGENCE. A railroad company permitted the smoke of burning slack to obscure the track at a crossing, all of which plaintiff knew, but there was no evidence that this contributed to the accident. There were cattle guards and snow fences along the r ght-of-way, but they were properly constructed and located. Plaintiff and four others did not hear the crossing whistle, but the engineer, and two others on the engine with him, swore positively that the whistle was sounded at the distance required by law (sixty rods), and the bell was set ringing. Four others testified to hearing the crossing whistle. *Held*, that negligence was not shown, and this, though the high rate of speed required the whistle to be sounded more than sixty rods from the crossing, since plaintiff, not having heard the signal that was given, would not have heard it had it been given sooner.

CONTRIBUTORY NEGLIGENCE. Plaintiff was driving an empty wagon, and had his head closely bundled up, and testified he listened, but heard no noise of an engine. He stopped two hundred yards from the crossing, and again at the edge of the right-of-way, and looked. and saw nothing coming. When he last looked the snow fence obscured the track, but had he looked after advancing a few feet he could have seen the track for three-fourths of a mile. From the time he first looked till he reached the track the engine had time to travel to a point out of vision to the crossing. The engineer and superintendent on the engine testified that plaintiff looked over his shoulder, turned around, and hurried up his horses; that he was fifty feet from the crossing, and still had time to avoid being struck; that they whistled again, and the engineer testified that he then applied the air. Plaintiff was familiar with the crossing, and knew no train was scheduled to pass, this engine being an extra. *Held*, that plaintiff was guilty of contributory negligence.

*Appeal from Boone District Court.*—HON. S. M. WEAVER, Judge.

SATURDAY, APRIL 8, 1899.

PLAINTIFF prosecutes this action to recover damages for personal injuries, and for injury to his property, caused, as is alleged, by the negligence of the defendant, and without fault or negligence on the part of the plaintiff. The defendant answered, denying generally, and, upon trial had, verdict and judgment for four thousand dollars were rendered in favor of the plaintiff. Defendant appeals.—*Reversed.*

*Hubbard, Dawley & Wheeler* for appellant.

*Whitaker & Dale* and *Edmund Nichols* for appellee.

GIVEN, J.—I. Appellant insists in argument on a reversal on four grounds, namely: That the evidence fails to show that the defendant was negligent in any of the respects charged; that the evidence does show that the plaintiff was guilty of negligence contributing to his injury; that counsel for the plaintiff was guilty of misconduct in the argument to the jury prejudicial to the defendant; and that the court erred in overruling the defendant's motion for a continuance.

As a disposition of the first two propositions involves a consideration of the evidence, we will state the substance and effect thereof, so far as material to the contentions: On the second day of December, 1895, the plaintiff, then residing some miles east of Boone, started west, on an east and west public highway, for that city, with a two-horse team and an empty farm wagon, with a double top box thereon, and a spring seat on top of the box. The day was clear, cold, and there was a strong wind from the northwest. Plaintiff was "warmly covered up," had a woolen scarf around his head and ears, and a cloth cap on his head over the scarf, with the roll or band turned down over his ears. Thus wrapped up, and seated in the spring seat, he drove along towards the crossing at a trot, having full control of his team. The general direction of the defendant's

track for about two and three-fourths miles east of Boone is from southeast to northwest, and the highway upon which plaintiff was driving is due east and west. At a point about two miles east of Boone there is a north and south highway crossing the east and west highway six hundred and twenty-eight feet east of where that highway crosses defendant's track. The north and south highway crosses the track a short distance south of where it crosses the east and west highway, and six hundred and sixty feet southeast of where the east and west highway crosses the track. It will be observed that there were two railroad and highway crossings only six hundred and sixty feet apart. They are known as the "Twin Crossings." The east and west highway is north of the track until the crossing is reached, and from there west it is south of the track. It will be seen that the crossing of the east and west highway and the railroad track is at a sharp angle. The track, from a point about three-quarters of a mile east of the Twin Crossings, to Boone, is straight, with a slight down grade to the west. East of that point it curves out of view from one at or near the crossing. Immediately east of the crossing of the north and south highway and the railroad, the track passes through a slight cut, on the north side of which, and forming a part of the right of way fence, is a close board snow fence, three hundred and sixty feet long and eight feet high. There were whistling posts to the east for each of these railroad crossings, at the required distances.

Some months before December 2, 1895, the defendant had deposited a quantity of coal slack on its right of way west of the east and west highway. Some time previous to this accident this slack had ignited, and at times, especially when a high wind prevailed, threw off smoke that somewhat obscured the view, and caused horses to shy, in passing the crossing. The defendant had refitted an engine in its shops in Boone to be used in drawing a fast mail train, a service in which more than ordinary speed was required, and in which it was necessary that the engine should "run cool;" that is,

that the journals should not become heated so as to compel delay. In the forenoon of December 2, 1895, this engine, without any cars attached, was taken out by N. S. Tedrow, engineer, and A. L. Fenn, fireman, accompanied by F. G. Benjamine, road foreman of engines, and E. J. Taylor, foreman of the shops, for the purpose of testing its fitness for the fast mail service. The engine was run east from Boone to Ames, and then west to Boone. When running west, at a speed of from forty-five to sixty miles per hour, the engine struck the wagon in which the plaintiff was seated, when on said crossing of the east and west highway. By the collision the plaintiff received serious and painful injuries upon his person, the horses were killed, and the wagon so broken as to be of little, if any, value. The plaintiff was at the time familiar with that crossing, having crossed it frequently and recently, and with the team he was then driving. He knew of the presence of the snow fence, the burning slack, and was familiar with the time of the passing of scheduled trains, and that no train was scheduled to pass at the time he went upon the crossing.

II. The negligence charged against the defendant may be summed up as follows: That for a long time prior to the accident the defendant "had carelessly and negligently constructed cattle guards, fences, and snow barriers along and upon its right of way, and had dumped at said crossing a large quantity of slack coal, allowing the same to become ignited, burn, and smoke, all of which obscured the view of the defendant company's track and right of way to persons going in the direction traveled by said plaintiff at said time, and before reaching said crossing;" that said engine "was running, at the time plaintiff was struck and injured, at an extraordinary, unusual, and dangerous rate of speed, and the employes of said company failed and neglected to make the usual, necessary, and customary alarms and warnings of its approach towards said crossing, either by ringing the bell or blowing the whistle, until it arrived so near the plaintiff that

he could neither cross said track nor back off of the same in time to avoid said engine,—in all of which plaintiff alleges said company was negligent, careless, and failed to use proper and necessary care." There is no evidence whatever tending to show that the defendant "had carelessly and negligently constructed cattle guards, fences, and snow barriers along and upon its right of way." So far as appears, these structures were not only properly constructed, but were also properly located. While there is no evidence to support this charge of negligence, the fact of the presence of these structures is proper to be considered in determining whether the defendant was negligent in other respects charged. As to the burning slack, it is said there is no evidence that the defendant deposited it where it was, but, whether or not it did so, it certainly permitted the slack to remain. We think it may be inferred from the fact that the slack was upon the right of way that the defendant put it there. Now, while it may be that depositing slack near a highway crossing, and permitting it to burn and throw off smoke, so as to obscure a view of the crossing and of approaching trains, might be negilgence, we find no evidence whatever that the plaintiff's view was thus obstructed. He says he believes that he remembers that the slack was burning and smoking that morning. He says: "I cannot recollect whether I saw any smoke that morning of the accident at the crossing or not." He nowhere says that his view was obstructed by the smoke, and the evidence of others, there at the time of the accident, or immediately after, leaves it beyond doubt that the smoke was not even remotely the cause of the accident. Plaintiff was familiar with the crossing, the presence of the burning slack, and had recently driven this same team over that crossing, and testified that he had the team under control at the time he approached the crossing. There is no evidence to support the charge of negligence in permitting the burning slack to be near the crossing, and that negligence was the cause of plaintiff's injury.

III.   The statute requires that the "whistle shall be twice sharply sounded at least sixty rods before a highway crossing is reached, and after the sounding of the whistle the bell shall be rung continuously until the crossing is passed." McClain's Code, section, 2003; present Code, section 2072. The evidence shows that whistling posts were placed sixty rods east of the Twin Crossings. In support of the charge that the defendant "failed and neglected to make the usual necessary and customary alarms and warnings," the plaintiff testified:  "I never heard the train whistle; never heard the bell ring." Mr. Briley, who was driving to Boone on the same road, and some distance in the rear of plaintiff, and who lived near the railroad and was accustomed to hearing signals, says:  "I cannot remember that I heard any signals whatever." Mr. Thompson, who was at his home near the Twin Crossings, says:  "I don't remember hearing any whistle at all that morning. Don't recollect whether I heard any whistle or not." Mr. Cordell, who was at his home near the crossings, says:  "I heard an unusual noise or whistling about the time, or just before they struck him. It was the alarm given; that is, the danger signal,—constant whistling. That is what attracted my attention." He was in his barn up to that time, and does not say anything as to the crossing signals. Mr. Nelson, called by the plaintiff, testified that he was sawing wood near these crossings. He says:  "The whistle first attracted my attention. I heard the crossing whistle is all I noticed. When I noticed this whistle, the engine was up to Mr. Craven's somewhere." It is evident that the whistle referred to by this witness was the danger signal, given just before the collision. As against this, we have the testimony of three of the men who were on the engine that the crossing signals were given at or near each of the whistling posts, and that the bell, which was rung by steam, was set ringing, and continued to ring until after the accident. N. S. Tedrow, the engineer, testified positively to the giving of these signals, and gives, as a reason

for remembering it, that his superiors were on the engine, and would soon have reminded him of the neglect if he had failed to give the signals. Miss Cordell, who was at her home, near the crossing, testified that she heard regular crossing whistle, and Mrs. Cordell testified that she heard the crossing whistle, and after that "I heard an alarm whistle,—continuous short whistling." She further says: "I could not say as to whether I heard two crossing whistles,—I would not be positive,—but I know I heard one, and am almost positive that I did the other, but I won't say as to that." Mr. Goess testified: "I remember to have heard a whistle for the crossing. Then, in a short time,—a few minutes,—I noticed another whistle." E. B. Cordell also testified that "he noticed the whistle at the crossing." The fact that plaintiff and others did not hear the crossing whistles sounded does not even create a conflict with this positive evidence that the signals were given at the whistle posts. It will be observed that the statute requires the whistle to be sounded "at least sixty rods before a highway crossing is reached." This distance is evidently prescribed in view of the fact that the time consumed in running sixty rods at usual railroad speed, will afford the traveler opportunity to avoid being upon the crossing. The court, having informed the jury as to the provisions of the statute with respect to crossing signals, instructed as follows: "If, however, by reason of the extraordinary speed at which the engine may be moved, or by reason of any known natural or artificial obstructions to the sight of persons using the crossing, it is found that a reasonable regard for the safety of such persons requires that such signals should be begun at a greater distance that sixty rods, then the omission so to do would be negligence." The court further instructed that if, by reason of such negligence, "the injuries complained of resulted to the plaintiff without fault on his own part contributing thereto, then he will be entitled to your verdict." There is no evidence that signals were given for the Twin Crossings except at or near the whistling posts, and, under the

evidence and the instructions, the jury was warranted in finding that the defendant was negligent in not sounding the signals more than sixty rods from the crossing. We think, however, there is an entire absence of evidence to show that such negligence or omission was the cause of the injuries complained of. The plaintiff, for reasons that will hereafter appear, did not hear the crossing signals that were given at sixty rods, and certainly would not have heard them if given at a great distance. He did not hear those given because of the manner in which his hearing was obstructed by the wraps he wore, and it does not appear that he was at any time in a more favorable condition for hearing than when the signals were given at the whistling posts. If he would not have heard the signals if given at seventy or eighty or more rods from the crossing, then the omission to give them was not the cause of the accident.

IV.    We now inquire whether the plaintiff was guilty of negligence contributing to his injury. Under repeated and undisputed holdings of this court, it was the duty of the plaintiff to look and to listen for trains before going on the crossing, and if, from any cause, he could not know, by looking or listening, while moving forward, whether or not a train was coming, he should have stopped until, by looking or listening, he did know that it was safe for him to cross. Though he was familiar with the time of trains, and knew that none were scheduled to pass there at that time, that did not excuse him from looking and listening, as the defendant had a right to run its engine, with or without trains, at any time. Three witnesses only testified to the manner in which plaintiff approached and went upon the crossing, namely, the plaintiff, the engineer, and Mr. Benjamine. The fireman, being on the south side of the cab, did not see the plaintiff until after he was struck. The plaintiff says he listened, but heard no signal nor noise of the engine; but he does not say that he stopped to listen to avoid the noise of his empty wagon, nor that he removed his cap, or the scarf

that was under it, from his ears.  We can readily believe that, thus wrapped and driving along, he did not hear any signals or sounds from the engines, but certainly, with proper care, he might have heard the approach of the engine.  If, however, his view was such that he could thereby know whether or not a train was approaching, he might be excused from stopping to listen and from removing his wraps.  It is evident that, as to listening, the plaintiff did not exercise reasonable care. He testifies that he looked twice,—First, at Cordell's Corners; and, second, at the edge of the railroad right of way,— and did not see anything coming.  He says that at Cordell's Corners "I just turned around my head this way and looked back, and drove ahead.  I could not see no train in sight anywhere back of me."  Cordell's Corners is six hundred and twenty-eight feet from the crossing, and it is apparent, from the gait at which plaintiff was driving (at a slow trot) and the speed of the engine, that the engine had not turned the curve so as to be in sight when plaintiff was at the corners and looked.  He traveled from the corners to the north line of the right of way, over five hundred feet, without looking again. He says: "I drove along just about the edge of the railroad right of way, and there I looked back again, and I saw none. Didn't hear anything.  Then I drove on."  He further states that he has no recollection of what happened after that.  The track was straight from the crossing for three-quarters of a mile to the east.  The snow fence, eight feet high, stood upon an embankment at the cut immediately east of the north and south highway crossing.  This fence ran lengthwise on the north line of the right of way.  The only point at which the snow fence would obstruct one's view of the track to the east was on the north line of the right of way and west of the fence.  At that point the fence was in the line of vision, and obscured a view of the track, but a step forward would bring the track into view.  It was at that point that the plaintiff last looked, and, although the engine must have turned the curve before that time, he did not see it because of the snow

fence. He must have known of that obstruction to his view, and that to advance a few feet forward or backward would carry him beyond it, and into full view of the track, yet he checked his horses into a walk, and drove one hundred and fourteen feet onto the crossing, without looking again. Benjamine and Tedrow were in the north side of the cab. Benjamine standing behind Tedrow. Benjamine says: "When we came into the cut where the snow fence is, I saw Mr. Payne driving along, and I made the remark to Mr. Tedrow that he had better blow the whistle again, as I thought that man had not heard it, and he did blow the crossing signal again. I think we blew the whistle again, and Mr. Payne looked over his shoulder, and turned around, and raised up the reins of his horses like this, and his horses started in a high speed, or at least going faster than they were. They were trotting along when we first noticed them. It appears to me he urged his horses on. He urged his horses forward. They seemed to increase their speed at once after that." He further says: "At the time Mr. Payne looked back, and hurried his horses forward, there was time then for Mr. Payne to have avoided getting struck, if he had tried to. He was then at some little distance from the crossing yet,—probably fifty feet or more." Mr. Tedrow testifies that he saw Mr. Payne about the time he whistled for the second crossing. He says: "When I blew the alarm for the second crossing, Mr. Payne was approaching the crossing at common, ordinary trot. About the time I whistled for the second crossing, Mr. Payne looked back towards the east,—towards me,—over his left shoulder. Mr. Benjamine called my attention to him,—that he did not think he was going to stop,—and I grabbed the whistle again, and made another alarm, and he did not appear to stop, and I applied the air." What we have set out is the substance of all the testimony of these three witnesses on this subject, and, after a careful reading of the entire testimony, we think that but one conclusion can be fairly and reasonably reached from it; which is that the plaintiff did not exercise reasonable and

ordinary care in going upon that crossing. He did not listen, as was his duty to have done, and he did not look, when to have looked would have warned him of the danger. Familiar with the crossing, and relying upon the fact that no train was scheduled to pass at that time, he went thoughtlessly and recklessly forward, without looking or listening when and as he should have done. These conclusions render it unnecessary that we should consider the other points urged by appellant, namely, that the court erred in overruling its motion for a continuance, and that counsel for plaintiff were guilty of misconduct in the argument of the case.—REVERSED.