TILDA H. HOFFARD, Admx., Appellant, v. ILLINOIS CENTRAL RAILWAY COMPANY, Appellee.

**Railways:** DUTY OF TRACKMEN AND TRAINMEN: CONTRIBUTORY NEGLIGENCE. An experienced trackman employed in the inspection of a track over which special or extra trains are frequently run is guilty of negligence in failing to keep a lookout for such trains, although rightfully upon the track and without notice

of a coming train; but it is also the duty of trainmen to keep a lookout, to give the crossing signals for the benefit of trackmen, upon which they may rely.

**Same:** NEGLIGENCE: DANGER SIGNAL: NEGATIVE EVIDENCE. The mere statement of witnesses that they did not hear a crossing whistle in contradiction of the positive evidence of trainmen that the whistle was sounded, is insufficient to create such a conflict in the evidence as to require a submission of that issue; it must appear that the negative testimony is based upon such knowledge as enables the witnesses to speak affirmatively against the fact.

**Same:** CROSSING SIGNAL. Where a danger signal was given when the train was some distance from an employé engaged in inspecting the track, so that had he been giving heed to the approach of the train he might have avoided the accident, but the signal was not heard by him presumably because of the manner of his head dress, the question of whether a crossing signal some distance farther away was given became immaterial.

**Rate of speed:** NEGLIGENCE: DUTY OF TRACKMEN. No particular rate of speed of a train in rural districts is in itself negligence; and it is not the duty of an engineer on approaching a curve to check his train so that upon discovering trackmen he may be better able to stop his train, but trackmen are supposed to take note of coming trains and to observe and keep out of their way.

**Same:** NEGLIGENCE: LAST CLEAR CHANCE. An engineer, who, upon discovering that a trackman is unconscious of his approaching train, adopts every possible means to avert his injury by sounding the whistle and bell and in bringing his train to a stop, performs his full duty.

*Appeal from Crawford District Court.*— HON. Z. A. CHURCH, Judge.

TUESDAY, FEBRUARY 5, 1907.

REHEARING DENIED, MONDAY, JUNE 8, 1908.

ACTION at law by plaintiff, as administratrix of the estate of Patrick Henry, deceased, to recover damages occasioned by the negligence of defendant as alleged, result-

ing in the death of said Henry. At the close of the evidence for plaintiff there was a directed verdict and judgment for costs in favor of defendant. Plaintiff appeals.— *Affirmed.*

*Shaw, Sims & Kuehnle* and *Sallinger & Korte,* for appellant.

*Connor & Lally* and *W. S. Kenyon,* for appellee.

BISHOP, J.— Patrick Henry was a section hand and track walker in the employ of the defendant company, and stationed at Arion, Crawford county. It was a part of his duties to inspect the track for a distance of about two miles east of the depot at Arion each Sunday morning. Conforming thereto, he left his home near the depot at about 7 o'clock on Sunday morning, January 12, 1902, and proceeded east to the end of his walk, and then faced about to return home. After going about half a mile, and walking between the rails, he was struck by a train approaching from the east, run down, and killed. A regular passenger train is scheduled to go west through Arion at a little before seven in the morning, and it appears that on the morning in question it was being run in two sections. The first section passed through before Henry went out upon the track. It is conceded that the engine carried signals indicating that a second section was following, but whether Henry saw the train and its signals, or was otherwise advised of the expected coming of the second section which struck him, is not known. The morning was cold, and Henry wore a cap well drawn down over his ears to keep them from freezing; in one hand he carried a flag, and in the other an instrument for testing the condition of the track. Just east of the place of the accident is a curve in the track. It begins three hundred and thirty feet east of a highway crossing and extends about

the same distance west of such crossing. On the north —
this being on the side of the curve — the surface of the
ground presents an embankment rising more or less abruptly
from the track level to a height of from fifteen to twenty
feet. The immediate circumstances of the accident were
known only to the engine crew of the train. Chapman, the
engineer, testified that his train was running from fifty to
fifty-five miles an hour; that he was sitting on the north
side of his engine, looking ahead, and that just before he
reached the highway crossing he was made aware of the
presence of a person ahead on the right of way. He says
that at first — and owing to the curve and embankment —
he could see only a man's head, and could not tell whether
such man was walking on the track or at the side thereof.
Further, that he at once sounded the whistle alarm, and a
second or two later he came into full view of Henry moving
west between the track rails, and apparently unconscious
of any impending danger — at least, he did not look around
or otherwise pay any attention to the sounding of the whistle
alarm or the ringing of the engine bell. Chapman says
that at once he put his engine in reverse motion and applied
the air brakes to the train — that being all he could do to
stop the train — but without avail. In a few seconds more
Henry was overtaken and hurled to his death. The point
of accident was about seven hundred feet west of the high-
way crossing. The statement of the engineer was corrobo-
rated in all material respects by the testimony of the fire-
man. The negligence on the part of defendant charged is
fourfold: (1) In failing to give proper warning of the
approach of the train. (2) In the excessive rate of speed
at which the train was being operated. (3) In not making
timely discovery of the presence of Henry on the track, and
failing to sound the alarm in time to enable him to escape
from the track. (4) In failing to avoid the accident by
stopping the train after the presence of Henry on the track
was in fact discovered. The answer denied generally, and,

in addition thereto, pleaded an assumption of risk and contributory negligence. The motion to direct a verdict, among other things, challenged the right of plaintiff to recover, for that a case of actionable negligence had not been made out. And, as we think the motion was properly sustained on this ground, we shall not be required to give attention to any of the others.

I. The first and third grounds of negligence may be discussed together. We start with the proposition that Henry was an employé of the defendant, and rightfully went out upon the track. It was proven that trains frequently went over the road in separate sections, and that "extras or special trains ran over the line pretty often." Henry was a man of experience, and presumably familiar with the general course of train operation. The evidence does not disclose that it was customary to notify trackmen of the running of trains in sections, or of extras, or specials, and it is no part of the contention of appellee that it was the duty of defendant to do so. From this it follows that, although Henry went rightfully on the track, he must be held to the expectation that a train might put in an appearance at any moment. And it was his duty to keep a lookout. One may not go blindly and heedlessly to his work where there is danger. *Magee v. Railway,* 82 Iowa, 249; *Haden v. Railway,* 99 Iowa, 735; *Keefe v. Railway,* 92 Iowa, 182. And as the presence of trackmen on the track during working hours is always to be expected, there is the correlative duty on the part of trainmen to keep a lookout for them, and, when discovered, to give warning of the approach of the train. Henry had the right to expect that this would be done.

So too, we think that, independent of his not having been discovered, owing to the curve in the track, and the topography of the adjacent surface, he had the right to expect that the whistle and bell signals required by statute

*1. RAILWAYS: duty of trackmen and trainmen: contributory negligence.*

to be given for the highway crossing would be given. It has been held, and justly so, that a failure to give such signals is negligence, not only as to persons rightfully attempting to cross the track, but as to persons rightfully on or near the track. " It may be presumed that the statute is intended to warn persons at the crossings of the approach of the cars, and thus enable them to avoid the engine. But the signal enables all persons who may be exposed to danger by the approaching engine to escape it, and such persons may rely upon the discharge of the duty required by the statute, as in all other cases, and act accordingly." *Lonergan v. Railway,* 87 Iowa, 755; *Ward v. Railway,* 97 Iowa, 50.

This brings us to the first question of fact presented: Was there a failure on the part of the enginemen to give the whistle and bell signals at the east quarter-mile post as they approached the crossing? The plaintiff relied upon three witnesses to establish the affirmative of this question. One Tripp, an aged farmer, living to the north of the track and between a half and three-quarters of a mile westerly from the east whistling post, testified that with his wife and grandson he was at breakfast as the train went by, and that he did not hear the sound of whistle or bell. He says that the house was tightly closed as the weather was cold; that there is quite a hill and a willow grove between his house and the crossing; that as near as he could remember the wind was blowing from the south. Mrs. Tripp testified that she did not hear the engine whistle sound or the bell ring, either as the train approached or after it had passed the crossing. She says that a great many trains passed daily, and she could hear the engines whistle as they passed to and frô without difficulty. The grandson testified that they were at breakfast and paying no attention to anything but the meal; that he did not hear the train in question whistle for the crossing or after it had passed. For the defendant, the engineer and fireman on the train each testi-

2. SAME: negligent danger signal: negative evidence.

fied in positive terms that the whistle was sounded at the whistling post, and that the bell was rung until after the crossing was passed. And both testified to the alarm whistle — several short, sharp blasts — after Henry was discovered on the track. A brakeman who was on the train testified that he was familiar with all the crossings along the line, and that the whistle was sounded and the bell rung for the crossing in question; that very shortly afterwards his attention was attracted to the alarm whistle, and almost immediately the air brakes were set on the train and the engine reversed. The conductor of the train did not remember hearing the crossing whistle, but testified positively to the danger whistle, to the application of the air brakes, and the reversal of the engine. A Mr. Bennett, towerman for the Northwestern Railway Company at its tower house in Arion, and Mr. Wigg, agent of the defendant company at Arion, both testified that they heard the danger whistle in the vicinity of the highway crossing in question. At the time, the former was in his tower, and the latter on his way from home to the depot. To summarize them, we have the testimony of three witnesses who were behind closed doors in a house more than a half-mile away, engaged at breakfast, who, while familiar with the passing of many trains daily, yet had no concern in the train in question, and were giving no attention thereto, who say they did not hear any whistle sound. As against this we have two witnesses directly charged with a duty in the premises, and another who was on duty in connection with the operation of the train, each of whom testified positively to the facts of the warning whistle and bell for the crossing, and the danger whistle at the crossing. And, in addition, we have three other witnesses who were equally positive that they heard the danger whistle.

Now, as said by Prof. Wigmore in his work on Evidence, section 664, it is altogether possible to negative the existence of a fact, state, or condition, by testimony " based

on what may be called *negative knowledge;* i. e., testimony that a fact did not occur, founded on the witness' failure to hear and see a fact which he would supposedly have heard or seen if it had occurred." And he adds that "the only requirement is that the witness should have been so situated that, in the ordinary course of events, he would have heard or seen the fact had it occurred." And this we conceive to be correct doctrine. Accordingly it is not enough to give rise to a conflict in evidence for a witness to say merely, "I did not. hear the whistle sound." He must go farther and show that he was not only in position to hear or see, but in mental condition to have heard or seen had the whistle been sounded. In other words, he must have knowledge on the subject derived through the medium of his senses — such knowledge as enables him to speak affirmatively against the existence of the fact. In this view, there was no such substantial conflict in the evidence in this case as to require a submission to the jury of the question whether or not the statutory warning was given for the crossing. The case is clearly within the facts of *Payne v. Railway,* 108 Iowa, 188, and should be governed by the rule of that case. There it appeared that the witnesses who testified they did not hear the engine signals were not in a situation to hear, or were not noticing for the purpose of hearing such a signal. And we held that such evidence did not even create a conflict with positive evidence to the effect that the signals were given. The cases of *Mackerall v. Railway,* 111 Iowa, 547, and *Selensky v. Railway,* 120 Iowa, 113, cited and relied upon by counsel for appellant, do not dictate a different conclusion. In the *Mackerall* case, the witnesses who testified that no signals were given were in a situation to hear and their attention was not otherwise diverted. And we said: "Such evidence is not negative merely, as where a person, at a considerable distance, and giving attention to something else, declares he did not hear signals." In the *Selensky* case the witnesses

were looking out for signals, and in the opinion the case is thus distinguished from the *Payne* case. But, in the instant case, if there was room to doubt as to the crossing signal, there can be none as to the giving of the danger signal.

Apart from the direct testimony of the witnesses, some presumption, as we think, may be indulged that an engineer who sees a human being on the track ahead of his

3. SAME: cross-ing signal.

engine will at least give warning of the danger. Observation teaches that locomotive engineers are not of the class bent on the wanton destruction of human life. Now, Henry did not hear the danger signal, owing presumably to the way his head was dressed, and, this being true, it cannot be assumed that he would have heard the crossing signal. And from this it follows that the question whether or not the crossing signal was given becomes immaterial. *Payne v. Railway, supra.* Both the enginemen say that, when the presence of Henry was first discovered on the right of way, and the danger signal was given, he was still more than six hundred feet away. And the conditions surrounding the accident make certain the truth of this statement. Had he been giving any heed to what was behind he had ample time to step off the track to a place of safety. No more than this is necessary to be said in making a full disposition of the third ground of negligence charged.

II.  There is no rule of law in this State governing the speed of railway trains in rural districts. In the absence of such rule no particular rate of speed, taken by

4. RATE OF SPEED: negligence: duty of track-men.

itself, can be said to constitute negligence. *Cohoon v. Railway,* 90 Iowa, 169; *Heiss v. Railway,* 103 Iowa, 590. Thus far counsel for appellant agree. But, as related to the second ground of negligence charged, it seems to be their thought that it was the duty of the engineer to check the speed of the train as it approached the curve so that upon discovering the

presence of Henry a stop could have been made and the accident avoided. And it is the argument that a finding of negligence based on such failure of duty, considered in connection with the speed of the train, could well be sustained. The contention is wholly devoid of merit. To begin with, there was no evidence tending to prove that the train was being operated at an unusual or excessive rate of speed. And no court has ever gone so far as to hold that it is incumbent on a railroad company to slacken the ordinary speed of its trains upon the approach to every curve in the track, which involves also a cut, as a precaution against injury to persons walking or working on the track. The reasons why such should not be the rule are obvious. Present-day conditions demand the maximum of speed consistent with train safety — this not only as in the interest of the operating company, but as related to the interests of the general public. Under a rule as contended for, such would not be possible of attainment in this country, where curves and cuts are of great frequency. Nor is such a rule necessary. Trackmen are supposed to take note of the coming of trains; it is a duty enjoined upon them by law " to observe and keep out of the way of moving engines and cars." *Keefe v. Railway,* 92 Iowa, 182, and cases cited. Accordingly an engineer in conducting his train over the track may well assume that trackmen will act in accordance with their duty to themselves, the company, and the public, and on no line of correct reasoning could he be made chargeable with negligence because they fail of their duty. His duty is measured simply by the doctrine of the " last clear chance." The cited cases of *Artz v. Railway,* 44 Iowa, 285; *Courson v. Railway,* 71 Iowa, 29, and *Stanley v. Railway,* 119 Iowa, 526, are not in point. Each of such cases involved an accident to a traveler in a highway crossing.

III. The fourth ground of negligence is predicated upon the doctrine of the " last clear chance." It was the undoubted duty of the engineer as soon as he discovered that

Henry was apparently unconscious of the approach of the
*5. SAME: negli-* train, and of the peril to him in remaining
*gence: last*
*clear chance.* on the track, to at once sound the alarm and
put the train under control, and avoid, if possible, running
him down. This is true without regard to any question
of negligence on the part of Henry. *Kelley v. Railway,*
118 Iowa, 387. But in respect of this it is sufficient to
say that the evidence all points to the conclusion that the
engineer adopted every possible means and spared no ef-
fort to avert the accident. Having done so, he and his em-
ployer must be held blameless.

Having concluded that a case of negligence on the part
of defendant had not been made out, we must hold that
there was no error in directing a verdict in its favor.—
*Affirmed.*