Joseph A. STEWART, Appellee,

v.

Justin W. MADISON and Earl R. Smith, Defendants,

and

Chicago and North Western Transportation Company, Appellant.

Justin W. MADISON, Appellant on Cross-Petition,

v.

CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, Appellee on Cross-Petition.

No. 61482.

Supreme Court of Iowa.

April 25, 1979.

Rehearing Denied May 24, 1979.

B. A. Webster and Bruce Johnson of Gamble, Riepe, Burt, Webster & Fletcher, Des Moines, for appellant (and appellee on cross-petitioner's appeal) Chicago and North Western Transportation Company.

George A. LaMarca and Louis A. Lavorato of Williams, Hart, Lavorato & Kirtley, West Des Moines, for appellee Joseph A. Stewart.

Gary R. Hassel, Des Moines, for Justin W. Madison, appellant on cross-petition.

LARSON, Justice.

The Chicago and North Western Transportation Company, a railroad, appeals from an order of the district court overruling its alternative motions for judgment notwithstanding the verdict or for a new trial, following a jury verdict against it in an action brought by an automobile passenger, Joseph A. Stewart. The driver of the car, Justin W. Madison, also appeals following a verdict against him on his cross-petition against the railroad. We affirm on both appeals.

These actions arose out of a collision between a car operated by Madison, in which Stewart was a passenger, and a train owned and operated by the railroad. The collision occurred at the intersection of the railroad

tracks and Easton Boulevard in Des Moines at approximately 10:15 P.M. March 24, 1973. Easton Boulevard is a paved, four-lane street running in a generally east-west direction and intersecting the tracks. A reproduction of the railroad's Exhibit 4, a scale drawing of the scene, is attached to this opinion, showing the intersection, the Freeman Decorating Building adjacent to the tracks, the warning signals, and the street lights illuminating Easton Boulevard.

The train approached the crossing from the north, operated by the engineer who was on the right-hand, or west, side of the lead engine. He was assisted by the head brakeman on his left. The Madison car approached from their left, on Easton Boulevard. The crossing was protected by automatic warning signals. These were operating at the time of the accident according to the witnesses, but Madison, the automobile driver, denied having seen them. The engineer testified that the train had been traveling at approximately thirty miles per hour before it reached the area of the intersection, but had slowed down before reaching the crossing, in compliance with a "slow order" of the railroad to reduce the speed in that area to ten miles per hour. He testified the train was going ten miles per hour at the time of the collision. Neither Stewart nor Madison were able to testify as to the speed of the train, but expert witnesses called by Stewart testified the speed might have been in excess of ten.

Other areas of conflict in the evidence were numerous, including sight distances of each of the operators, whether the train whistle was sounded prior to the collision, and even whether the train struck the car or the car struck the train. However, when considering a motion for judgment notwithstanding a verdict, the trial court must view the evidence in the light most favorable to the verdict, regardless of whether it is contradicted, and the verdict must be aided by every reasonable inference from the evidence. *Paulsen v. Des Moines Union Railway,* 262 N.W.2d 592, 594 (Iowa 1978); *Winter v. Honeggers' & Co.,* 215 N.W.2d 316, 321 (Iowa 1974). In addition, as to the railroad's motion for new trial, a mere conflict in the evidence is not sufficient to require the granting of it. If disputes are factual and there is substantial evidence to support the jury's determination of the facts, a new trial will not be granted "merely because reasonable men might disagree with the jury's conclusion." *Northrup v. Miles Homes, Inc.,* 204 N.W.2d 850, 861 (Iowa 1973).

The specific facts, as they bear on each of the issues raised on appeal, will be considered in light of those principles. The issues are as follows, with respect to passenger Stewart's claim against the railroad: (1) whether there was sufficient evidence to submit issues of speed, lookout and warning to the jury; (2) whether the doctrine of "last clear chance" was properly submitted; (3) whether Madison, the driver, was contributorily negligent as a matter of law; (4) whether the court erred in refusing to allow evidence of the settlement of Stewart's suit against Madison and evidence of the receipt by Stewart of "collateral payments"; and (5) whether the court erred in refusing to allow testimony of the train engineer concerning the custom of drivers to maintain their speed until abruptly stopping at railroad crossings.

Madison, the driver of the car, raised one additional issue as to his unsuccessful cross-petition against the railroad: whether the court erred in instructing the jury on contributory negligence as a defense, rather than comparative negligence.

■ 1. *Sufficiency of evidence on speed, lookout and warning.* The trial court submitted the issue of speed to the jury, as one of the three allegations of primary negligence. The railroad contends there was not sufficient evidence of speed to permit its submission because the only direct evidence as to speed came from the engineer who testified the train was traveling ten miles per hour, and this was a reasonable speed as a matter of law, relying upon *Strom v. Des Moines and Central Iowa Railway,* 248 Iowa 1052, 1065, 82 N.W.2d 781, 789 (1957). Plaintiff Stewart contends that there was substantial evidence in the form of expert

testimony from which the jury could find the train was going over ten miles per hour and that in any event ten miles per hour could be found by the jury to be unreasonable under the circumstances.

In *Strom,* the court stated that:

We think too there is insufficient testimony to support the second charge of excessive speed. The engineer says the train was going 10 to 12 miles an hour when the emergency brakes were applied at the west edge of the crossing. Although doubt may be thrown on this evidence by the fact the train traveled some 250 feet or more after the brakes were applied (when four of the 14 cars were empty) we are unable to find substantial support for this charge.

248 Iowa at 1065, 82 N.W.2d at 789. In ordering retrial, the court in *Strom* ordered only issues of warning to be submitted, striking allegations of speed and lookout.

In viewing the evidence concerning speed in the light most favorable to the plaintiff, the jury could have found the speed to be in excess of ten miles per hour. Expert witnesses called by the plaintiff testified that based upon the braking capabilities of the train, the weather and other conditions existing at the time of the collision, the train could have been stopped in a substantially shorter distance than that actually required if it had been going only ten miles per hour. The jury could conclude from this that the speed was, in fact, in excess of ten. Also, from the evidence the jury could find the crossing was one which required an extra degree of care because of the circumstances. The partially obstructed view of street traffic approaching the crossing from the east because of the Freeman Decorating Building, the time of day, the relative darkness of the area adjacent to the crossing from which the train emerged, the fact that the crossing was in a populous city area, the lack of warning gates or signalmen, the lack of an oscillating headlight on the train, and the relatively long distance required to stop or substantially slow it down were all factors to be considered by the jury in determining whether the speed of the train was reasonable under the circumstances.

In *Daly v. Illinois Central Railroad,* 250 Iowa 110, 114, 93 N.W.2d 68, 71 (1958), we said that:

[N]o amount of speed of a railroad train is in and of itself negligence except where regulated by statutes or ordinance. But there is also the rule that any speed may be negligence if, under the circumstances of the particular situation, a slower rate of advance is called for in the exercise of reasonable prudence.

In *Daly,* circumstances including obstructions of view, weather conditions, sloping of the intersecting street, and the warnings given by the town were considered in determining whether a jury issue had been generated on speed. We held that it had.

It is true that *Strom* held a speed of ten to twelve miles per hour was not sufficient to entitle plaintiff to submission of the speed issue to the jury. The surrounding circumstances are not shown to be similar to those in the present case, however, and the principle is well established that each case must be determined upon its own facts as bearing upon reasonableness of speed. We said in *Strom* that "[m]any of our railroad-crossing cases point out in substance that precedents are of little value because the facts control and they differ." 248 Iowa at 1062, 82 N.W.2d at 787. *See also Daly,* 250 Iowa at 114–15, 93 N.W.2d at 71–2; *Jasper v. Chicago Great Western Railway,* 248 Iowa 1286, 1296–97, 84 N.W.2d 21, 28 (1957).

Given the deference accorded jury verdicts on behalf of the prevailing party, we cannot say there was no substantial evidence from which the jury could find excessive speed. The trial court was correct in submitting the issue of speed to the jury.

■ The court also submitted the issue of lookout to the jury. The railroad contends this is error, because there was not sufficient evidence to support it. In determining issues of lookout, precedents are of little value and each case must be viewed in light of the circumstances. *Roberts v. Chicago and Northwestern Railway,* 253 Iowa 646,

651, 113 N.W.2d 269, 272 (1962). The duty of lookout as to trains is discussed in *Roberts,* where we applied the same standard as in automobile cases. In quoting from an earlier case, we said:

> "Proper lookout means more than to look straight ahead, or more than seeing the object; that it implies being watchful of the movements of his own vehicle as well as the movements of the thing seen; that it involves the care, prudence, watchfulness and attention of an ordinarily careful and prudent person under the circumstances."

253 Iowa at 649, 113 N.W.2d at 270–71. In that case we also said that as to a train operator, "[t]he lookout that is contemplated by the law means a lookout that will enable the party keeping it to discover, in the exercise of reasonable care, the presence of persons on the track in time to give them warning of the danger, and to prevent injury to them by the application of the brakes or the other means at hand." 253 Iowa at 650, 113 N.W.2d at 271, *quoting Southern Railway v. Sanders,* 145 Ky. 679, 141 S.W. 77 (1911).

*Roberts* also discussed the question of whose duty it is, among the engine personnel, to maintain a proper lookout. The design of a train engine obviously presents problems of lookout not found in other types of vehicles. In this case, the engineer was seated on the right-hand, or west, side of the engine, and the brakeman was on the left. The Madison-Stewart car approached from the east, or the brakeman's side of the engine. To see a vehicle approaching from the east, the engineer would have to look across the interior of the engine a distance of nine to ten feet. The brakeman was obviously in a better position to observe the approaching car, but if he did, he did not convey this information to the engineer. The brakeman did not testify at the trial, and his whereabouts were unknown. The engineer testified, however, that the first mention of the car's presence by the brakeman was after the impact, when he told the engineer that the car had hit the train.

The railroad contends there is no evidence that the engineer or brakeman failed to keep a proper lookout, citing *Hoyt v. Chicago Rock Island & Pacific Railroad,* 206 N.W.2d 115, 119 (Iowa 1973). In *Hoyt,* the engineer and brakeman both testified they first observed the car some 750 feet from the crossing, when the train was at least 1200 feet from the point of impact. They both stated their view was without interruption until the collision, and the emergency brakes were set as soon as they saw the driver did not attempt to stop. This is distinguishable from the present case, however. Here there was evidence that the engineer realized when he was 250 to 300 feet from the crossing that the car was "going to try to beat the train." He estimated the speed of the car at 40 to 45 miles per hour when it was approximately one-eighth mile from the crossing, at which point the car began to accelerate. The engineer testified that he looked away, apparently to attend to other duties, and when he again looked at the car, the train was only 100 feet from the crossing. The point at which the train's brakes were applied was disputed at the trial. The engineer testified that he applied the emergency brakes at 60 to 100 feet from the crossing. There was evidence, however, from which the jury could find that the brakes were not applied until after the collision. The jury could find that the engineer looked away from the car at a time he knew it was not going to stop, that he did not request the brakeman to maintain a lookout while he diverted his attention to his "other duties," and did nothing to avoid the collision until after it had happened.

There is authority for Stewart's contention here that lookout is the duty of the engineer—not the brakeman. In *Roberts v. Chicago & Northwestern Railway,* 253 Iowa at 651, 113 N.W.2d at 271, we said:

> [T]he engineer was the person in charge of the switch engine and of the train. He is the only person who can start and stop the train. In the second place the other members of the crew who were in the cab were subject to his supervision and the evidence shows that whatever happened

with reference to plaintiff [driver of car] was communicated by the other members of the crew to the engineer.

The brakeman was in a position to see the car, but even assuming the railroad's duty of lookout may be performed by him, rather than the engineer, his observations would be of no avail unless conveyed to the engineer, who had the means to stop or slow the train. Here, the jury could conclude from the evidence, including the engineer's testimony, that the brakeman did not observe the car's position of peril, or if he did, the engineer was not advised of it until the belated news that a collision had already occurred.

It is true, as urged by the railroad, that there was evidence the engineer observed the car at all times when it was not obscured from view, and the jury could have so found; it did not, however, and we cannot say the jury reached the wrong conclusion on this issue or that the court erred in submitting it.

The trial court also submitted the issue of the train's failure to sound its whistle prior to the collision. The railroad contends this was error. Section 327G.13, The Code, requires a bell and horn shall be placed upon each locomotive, that the horn shall be sounded at least 1000 feet before reaching a crossing, and that a bell shall be rung after the horn is sounded and until after the crossing is passed. The horn may be omitted within cities, unless required by city ordinance or resolution, but there is no provision for omitting the bell ringing. Damages are provided for in the statute for a railroad's failure to comply.

█ No city ordinance or resolution required sounding of a horn in this location; however, sounding of a horn may be required despite a lack of statutory requirement under the common-law principle of reasonable care under the circumstances.

Instruction 17 submitted by the court stated that:

> The law of Iowa does not require a train to sound a horn or ring a bell within the limits of a city or town unless required by city ordinance to do so. However, circumstances may require that a whistle be sounded or bell rung, and if you find that circumstances do require the sounding of whistle or ringing of a bell, then failure to do so would constitute negligence.

We said in *Glanville v. Chicago, Rock Island & Pacific Railroad,* 196 Iowa 456, 461–62, 193 N.W. 548, 550–51 (1923) that:

> The statute does not provide that the *whistle* shall be sounded within the limits of a town as a train approaches a crossing. Nevertheless it may be a jury question, under all the facts and circumstances, whether in the exercise of reasonable and ordinary care the sounding of the *whistle* was required. It was a railroad crossing. It was located in the town. It was a used crossing.
>
> It is not sufficient under all circumstances that a railroad shall observe only the mandate of a statute. Statutory provisions are viewed as the minimum of care. The degree of care required of a railroad train in approaching a crossing is such as should be used under all the circumstances and this is usually a question for the jury. The fact that the railroad company gave such signals as are required by statute does not necessarily absolve it from giving such other and additional signals or warnings as ordinary care and prudence would dictate under the circumstances of the particular case. (Emphasis added.)

The railroad here does not challenge this principle; it contends only that there was not sufficient evidence to support a finding that warnings were not given by the train. Actually the only error apparent in the instruction favors the railroad. It stated that the law does not require sounding of a horn *or bell* within city limits absent an ordinance, whereas in fact it only excuses sounding of a horn under such circumstances.

The engineer testified he sounded the horn a quarter-mile away from the crossing and began to ring the bell at the same point. He testified he continued sounding

the horn and bell up to the time of impact. Two other witnesses, Sylvia Huntley and Sharon Huntley, were stopped at the crossing, headed east. Sharon testified she heard a horn, but neither testified she heard a bell. Stewart and Madison testified they heard neither a horn nor a bell.

The railroad contends that evidence that witnesses heard no warnings, since it is of negative character, is insufficient to overcome affirmative evidence that they were sounded. We do not agree, however. In the first place there is no evidence, other than the engineer's testimony, that a bell was ever sounded or whether the horn was sounded in time to avoid the accident. In fact, the railroad does not even raise on appeal the issue of sufficiency of the evidence as to failure to ring a bell—only as to the sounding of a horn. In the second place, where there is a conflict in the evidence as to the sounding of a horn (or "steam whistle" in prior statutes, e. g., § 478.19, The Code 1975), it has usually been held to create a jury issue if the persons claiming that none was heard were in a position to have noted the warnings had they been given.

The rule in Iowa as to the sufficiency of the evidence to submit failure to warn is set out in an early Iowa case, *Chilcote v. Chicago & Northwestern Railroad,* 206 Iowa 1093, 1096, 221 N.W. 771, 772 (1928) as follows:

> This brings us to the sufficiency of the evidence of the pleaded negligence to go to the jury. The particular question of fact is whether there is testimony upon which the jury might base a finding that the whistle was not sounded or the bell rung for the highway crossing, as pleaded. This depends on the further inquiry whether the witnesses testifying on the subject were in a position physically, and in an attitude mentally, both to hear and to be impressed with the fact of the absence of the blowing of the whistle, if it was not blown, or the ringing of the bell, if it was not rung.

Were Stewart and Madison in a position and attitude to have heard a horn sounded?

The driver's window was down two or three inches. Madison testified on cross-examination as follows:

> Q. As you came toward the tracks, did Joe say something that attracted your attention? A. Yeah, he was goofing off, said something silly like. We both started laughing. I can't recall what it was.
>
> Q. Did some remark he made cause you to laugh? A. Yes.
>
> Q. Were you looking at him? A. Yes.

The railroad contends the occupants were therefore not in a position or attitude to have heard a horn or bell and therefore their testimony that they had heard no warning was not sufficient to generate a jury issue. There was sufficient evidence that these witnesses were "so situated that in the ordinary course of events [they] would have heard . . . the fact had it occurred." *Koll v. Manatt's Transportation Co.,* 253 N.W.2d 265, 271 (Iowa 1977). The claimants in this case were clearly in a position to hear; in fact, subsequent events establish they were too close to the tracks. The facts are distinguishable from *Hoffard v. Illinois Central Railway,* 138 Iowa 543, 549, 110 N.W. 446, 448 (1908), where the "negative testimony" witnesses were behind closed doors in a house more than a half-mile away and were "paying no attention" to the train. It would be unreasonably restrictive to give their testimony no weight merely because they were less attentive than others would be under similar circumstances. As this court said in *Hines v. Chicago, Milwaukee & St. Paul Railway,* 196 Iowa 109, 113, 194 N.W. 188, 190 (1923), "[t]he instant testimony [that no warning was heard] . . . cannot be classified as merely negative. It had some probative value. . . . Under the circumstances of the case at bar a trial court is not privileged to ignore such testimony and hold that it is not entitled to any weight."

*Wigmore* in discussing this area has said:
> [I]n applying the foregoing principle requiring that the witness' inferences be based on adequate data . . ., Courts have often been asked to exclude

testimony based on what may be called *negative knowledge, i. e.* testimony that a fact did not occur, founded on the witness' failure to hear or see a fact which he would supposedly have heard or seen if it had occurred.

Yet there is no inherent weakness in this kind of knowledge. It rests on the same data of the senses. It may even sometimes be stronger than affirmative impressions. The only requirement is that the witness should have been so situated that *in the ordinary course of events he would have heard* or seen the fact had it occurred. This sort of testimony is constantly received,—particularly in proof of the *failure to give railroad signals,* the loss of a chattel, the absence of a witness, the non-existence of a fictitious person, the non-payment of money, and other negative facts. (Last emphasis added.)

2 *Wigmore on Evidence* § 664, at 777–78 (3d ed. 1940). After he concludes "there is no inherent weakness in this kind of knowledge" (*Id.* at 778), he states that:

Nevertheless, from some source not traceable, there lingers in the judicial mind, in many quarters, an antiquated notion that *negative impressions are not so probative* as affirmative impressions; and a charge to the jury often embodies that notion, where the witnesses differ. The truth is that the conditions affecting correctness and fullness of observation are so numerous and varied that the one under consideration has a negligible or minor status. Modern psychology sneers at the law's crude assumption that the complexities of human perception can be handled by some rules of thumb about negative testimony or the like. (Emphasis in original.)

*Id.* at 781–82.

*See also, Koll v. Manatt's Transportation Co.,* 253 N.W.2d 265, 271 (Iowa 1977).

We conclude Stewart and Madison were so situated that "in the ordinary course of events" they would have heard the train's warnings. They testified they heard none. It is possible that the Freeman Decorating Building, which was between them and the train at certain intervals obstructed their hearing the horn, if it was sounded, while Mrs. Huntley, on the opposite side of the crossing and without obstruction, could hear it. If so, this would be a "circumstance" dictating the type and manner of warning required. In any event, we cannot conclude that all reasonable minds must agree that adequate warnings were given, particularly in view of the fact that none of the disinterested observers testified a bell was sounded as required by statute. This issue was properly submitted to the jury.

■ 2. *Last clear chance.* The doctrine of "last clear chance" was discussed in *Tilghman v. Chicago & North Western Railway,* 253 Iowa 1339, 1343, 115 N.W.2d 165, 168 (1962) as follows:

The doctrine of last clear chance presupposes plaintiff's contributory negligence. It applies where there is evidence defendant (1) has actual knowledge of plaintiff's situation, (2) realizes or should in the exercise of reasonable care realize he is in peril, (3) has the ability to avoid injury to plaintiff thereafter and, of course (4), fails to do so.

The railroad contends there was not sufficient evidence to submit this issue to the jury in any form, and that even assuming it was properly submissible under the facts, it was submitted in an improper manner. It claims, as to the sufficiency of the evidence, that Stewart's evidence, in its most favorable light, shows that Stewart's position of peril could not have been discovered until it was too late to stop, or slow the train sufficiently to avoid the collision. There was evidence, however, from which the jury could have found that only a slight reduction in speed of the train would have been sufficient to avoid the collision, and in less than a full second the car would have cleared the tracks. The engineer stated at one time that he realized the car was not going to stop when the train was 250 to 300 feet from the crossing. The railroad contends the car was not in a position of peril at that time, because at the speed testified to by Stewart and Madison, they could have

easily stopped the car short of the crossing. However, the engineer by his own statements acknowledged he knew the car was not going to stop while he was still 250 to 300 feet from the crossing. There was substantial evidence the train could have been stopped in that distance. We cannot agree that all reasonable minds would conclude the train could not have been stopped or sufficiently slowed down, in the time available following the engineer's knowledge of the car's predicament. It was proper to submit last clear chance. In any event, as discussed later, the jury found that the railroad did not have the last clear chance to avoid the collision, so the railroad has not been prejudiced by its submission.

The railroad also contends the doctrine was not submitted in the proper form, in that there were two separate instructions on it, unduly emphasizing the doctrine; that a special interrogatory as to last clear chance should not have been given and that when the jury failed to answer it completely, the court erred in refusing to order its completion. It also contends that the answers given to the special interrogatories were inconsistent with the general verdict.

General verdict forms were submitted on Stewart's claim and Madison's cross-petition. The jury returned a verdict in favor of Stewart on his claim and in favor of the railroad on Madison's cross-petition. The jury also answered four special interrogatories, the first asking if the railroad was guilty of negligence which was a proximate cause of the collision and it answered "yes." The second asked if Stewart was guilty of contributory negligence which was a proximate cause, and it answered "no." Answer to the third interrogatory established Madison was guilty of contributory negligence. The fourth interrogatory asked if the railroad had the last clear chance to avoid the collision as to each claimant. The jury responded "no" as to Madison but did not answer it as to Stewart.

■ The fourth interrogatory is significant in this appeal. The railroad argues it should not have been given at all, because it was couched in terms of "last clear chance"

rather than proximate cause, citing *Ackerman v. James,* 200 N.W.2d 818 at 830 (Iowa 1972). It claims this was confusing to the jury in view of the fact a separate proximate cause instruction was given. We agree that it should have been submitted as proximate cause, but decline to hold it was reversible error in this case. The trial court associated the two concepts in Instruction 30 by stating that despite a claimant's own negligence "he might still recover under the doctrine of last clear chance as it may apply to the question of what is the *proximate cause* of the collision in question." (Emphasis added.) Further, *Ackerman* said it was preferable to couch the concept solely in terms of proximate cause—it did not say it was error to do it in terms of last clear chance. We hold it was not error to submit interrogatory four to the jury.

■ When the jury returned the incomplete answer to interrogatory four, the court refused to require it to be completed to show whether the railroad had the last clear chance as to Stewart. It stated that:

It appeared to the court that the jury had found in substance it was concurrent negligence here and they found that the question of last clear chance insofar as, that it wasn't applicable or at least as between the railroad and the car, they found that the defendant railroad did not have the last clear chance to avoid the collision. I don't think the findings as they are stated by the jury are inconsistent with the verdicts  .    . ..

We agree with the trial court. If the jury found the railroad did not have the last clear chance as to Madison, the driver, it certainly cannot be said a different finding could be made as to Stewart, who was in the same car. Stewart contends that this makes the matter of last clear chance largely academic, and we agree.

We conclude the court did not err in submitting last clear chance in the manner in which it did. In any event, the railroad, which prevailed on that issue, was not prejudiced by it.

Clarification of our position should be made with regard to the doctrine of last clear chance, following our decision in *Ackerman v. James*, 200 N.W.2d 818 (Iowa 1972). There we indicated that it was preferable to couch the concept in terms of proximate cause, but did not expressly abolish it. Submitting a separate issue of last clear chance, however, adds nothing to the basic concept of proximate cause, could unduly emphasize the elements common to both doctrines, and is almost certain to confuse a jury. We refer in this regard to *Ackerman's* discussion of the issue. 200 N.W.2d at 829–31. We go a step further now and abolish last clear chance as a separate doctrine in all cases commenced after the filing of this opinion. The elements previously applied as a part of the last clear chance doctrine shall, in all cases where they are applicable, be submitted as issues of proximate cause.

3. *Contributory negligence of Madison as matter of law.* At the trial, the railroad moved unsuccessfully for a directed verdict against both Stewart and Madison on the basis they were contributorily negligent as a matter of law. It now contends that the submission of the issue of Madison's contributory negligence was prejudicial to it in Stewart's case. (The jury found Stewart was not contributorily negligent.) We fail to find any basis for the contention that contributory negligence of Madison, even assuming it was established as a matter of law, could have been prejudicial to the railroad. The jury found Madison was contributorily negligent anyway. In any event, this is not an "exceptional case" in which contributory negligence could be found as a matter of law. Iowa R.App.P. 14(f)(10). *See also Paulsen v. Des Moines Union Railway*, 262 N.W.2d 592, 596 (Iowa 1978), where we said that:

> Contributory negligence is not to be found as a matter of law unless it is so palpable, flagrant and manifest that no other conclusion is reasonable.

4. *Evidence of settlement of portion of suit and of receipt of "collateral source" payments.*

A. *Prior settlement.* Stewart originally sued both Madison, as driver, and the railroad. Prior to trial he settled his case against Madison. He also received property damage reimbursement under his comprehensive automobile policy. The railroad contends it should have been allowed to inquire into those areas at trial, and it was error to refuse it.

As to the settlement, Stewart contends it was a "compromise" excludable under our existing rule. *Hoover v. First American Fire Insurance Co.*, 218 Iowa 559, 563–64, 255 N.W. 705, 707 (1934); *accord*, Rule 408, Federal Rules of Evidence. The railroad contends that it should have been permitted to show the settlement as "bearing upon [Stewart's] credibility and as bearing upon the change of the story of Stewart as to the amount of drinking Madison had done." The court did not limit defendant's right to impeach Stewart on the basis of prior inconsistent statements; in fact it specifically ruled that this could be done. Inquiry as to prior inconsistent statements, if any, was permitted by the trial court; it just did not permit evidence as to the *reasons* for such inconsistencies. Although this latitude might be proper as to other areas of impeachment, it runs head-on in this case with the strong policy considerations favoring settlements and discouraging their use in a manner which might place a chill on settlements or settlement attempts. *See, e. g.*, Advisory Comment to Federal Rule of Evidence 408. Under these circumstances it was not error to restrict evidence of the settlement in the manner of the trial court.

B. *"Collateral source" payments received.* Defendant railroad sought to introduce evidence of payments received by Stewart under the "comprehensive" provisions of an automobile insurance policy, and the trial court refused. Defendant contends this was error, and that our "collateral source" rule should be overruled. We have adhered to this rule in the past, for the reasons as set out in *Clark v. Berry Seed Co.*, 225 Iowa 262, 271, 280 N.W. 505, 510 (1938), where we said:

The weight of authority is conclusive to the effect that a defendant owes to the injured compensation for injuries, the proximate cause of which was his own negligence, and that the payment by a third party cannot relieve him of this obligation; that regardless of the motive impelling their payment, whether from affection, philanthropy or contract, that the injured is the beneficiary of the bounty, and not the defendant who caused the injury. If, as contended, the Bell Transfer Company [third party] is obligated to pay for the services rendered by these doctors, the appellant has no equity or legal claim to share therein. The contention of appellant, if the same should be sustained, would result in its receiving the benefit of payments made by the Bell Transfer Company, either as the result of gratuity or of contract, for injuries sustained because of its own negligence.

In *Conley v. Warne,* 236 N.W.2d 682, 688 (Iowa 1975) and *Rigby v. Eastman,* 217 N.W.2d 604, 609 (Iowa 1974) that position was reaffirmed. We adhere to that rule in this case.

5. *Ruling on motion in limine.* The railroad contends the trial court erred in sustaining a motion to limit defendant's evidence, claiming the engineer had frequently observed vehicles drive up to crossings and stop abruptly, and that this was his state of mind immediately prior to this collision. The railroad contends that the state of mind of the engineer was relevant on the issue of "last clear chance." As we have previously pointed out, there was evidence the engineer thought when the train was 250 to 300 feet from the crossing that the car was not going to stop, and that it was therefore in a "zone of peril" for purposes of last clear chance. The railroad contends the ruling of the trial court prevented contrary evidence from being admitted. If permitted, it says, it would have shown the engineer really did not perceive the car to be in a zone of peril but thought it was going to maintain its speed then stop abruptly at the tracks.

We have held that a person may testify directly as to his intent, motive or reasons inducing his action where such was material even though it is in the nature of a conclusion. *See Torrence v. Sharp,* 246 Iowa 460, 463, 68 N.W.2d 85, 87 (1955). The ruling on the motion in limine here, though, did not prevent such testimony; it went only to the matter of the engineer's testifying to the habit and custom of drivers generally in stopping abruptly. The motion stated:

1. Since it is immaterial, incompetent, irrelevant and an opinion and conclusion of a witness to this suit whether or not:

(a) Defendant or any witness for defendant has had a frequent experience of motor vehicles approaching a railroad crossing at a continuous speed right up to the crossing and abruptly stopping . . . .

We have held such evidence, regarded as a matter of common knowledge, is not a proper subject for expert testimony. *See Tilghman v. Chicago & North Western Railway,* 253 Iowa 1339, 1351–52, 115 N.W.2d 165, 173 (1962). Further, a trial court is given considerable, although not unlimited, discretion in determining admissibility of evidence of custom on the question of negligence. *Id.,* 253 Iowa at 1353, 115 N.W.2d at 174.

The ruling of the trial court was within its discretion here and, even if improper, did not limit the evidence in the manner as contended by the railroad. It could still have introduced the engineer's testimony as to his state of mind. If unduly limited in its presentation of evidence on the matter, it was apparently because the railroad read into the motion and order more restrictions than they actually imposed. It was not prejudiced by the ruling itself.

6. *Comparative negligence instruction.* At the trial, Stewart requested an instruction on comparative negligence in lieu of contributory negligence. He was later joined in that request by Madison. The trial court refused to so instruct and Madison raises this as his sole ground for

reversal in his case. The proposed instruction was as follows:

> [I]f you find from a preponderance of the evidence in the case that the Defendant was guilty of negligence which caused in whole or in part any injury or damage to the Plaintiff Stewart and should further find from a preponderance of the evidence in the case that the Plaintiff Stewart himself was guilty of some negligence which contributed toward bringing about all or part of his own injury, then the total award of damages to the Plaintiff Stewart must be reduced by an amount equal to the percentage of fault or negligence chargeable to the Plaintiff Stewart.

The railroad responds that the issue of comparative negligence was not timely raised, not having been presented at any time prior to Madison's oral objections to the court's instructions. Neither claimant pled comparative negligence.

We do not decide the matter of timeliness of Madison's request, because we conclude that the change in law sought by Madison is more properly left to the legislature.

Madison contends the defense of contributory negligence originated in the courts and the courts should, therefore, be responsible for its modification or abolishment. A similar argument has been raised previously in this court as to the status of sovereign immunity, and whether the courts or the legislature should undertake to make the changes felt to be necessary in the doctrine. *See Boyer v. Iowa High School Athletic Association,* 256 Iowa 337, 127 N.W.2d 606 (1964). By a narrow majority this court there concluded that the matter should be left to the legislature. Two considerations make the present case an even less likely candidate for judicial change. First, the legislature had not directly inserted itself into the issue of sovereign immunity prior to *Boyer;* it remained almost solely a creature of the courts.[1] On the other hand, the legislature has become involved in the areas

of comparative and contributory negligence. For example, section 619.17, enacted in 1966, recognizes it as a complete defense, providing in part that:

> In all actions brought in the courts of this state to recover damages of a defendant in which contributory negligence of the plaintiff, actual or imputed, was heretofore a complete defense or bar to recovery, the plaintiff shall not hereafter, have the burden of pleading and proving his freedom from contributory negligence, and if the defendant relies upon negligence of the plaintiff as a complete defense or bar to plaintiff's recovery, the defendant shall have the burden of pleading and proving negligence of the plaintiff, if any, and that it was a proximate cause of the injury or damage. . . .

Also, section 327D.188, The Code, provides that in a suit against a railroad, an employee's negligence, if any, will only result in reduction of his recovery "in proportion to the amount of negligence attributable to such employee," a form of "pure" comparative negligence. Iowa Rule of Civil Procedure 97 provides that in other employee suits against employers, contributory negligence will not be a bar to recovery, but shall result only in "mitigation" of damages. Our legislature has, therefore, neither been silent nor inactive in the areas in question.

A second reason for concluding that we should not seek the change requested is that there does not seem to be the general agreement of the need for a change that existed at the time of *Boyer*. In that case, the desirability of such change was not even questioned, only the means of accomplishing it divided the court. Comparative negligence, on the other hand, has not been welcomed with the same unanimity, and although the current trend is toward its adoption, there is still resistance to the doctrine among some courts. *See Am.Jur.2d*

---

1. The legislature had indicated a very limited involvement in the area of sovereign immunity by authorizing purchase of liability insurance

and at least one oblique statutory reference to the doctrine. *See* discussion in *Boyer,* 256 Iowa at 347 48, 127 N.W.2d at 612–13.

*New Topic Service* "Comparative Negligence," §§ 5, 6, at 7–8 (1977).

Whether Iowa should adopt the theory is basically one of policy, which would be better handled through the legislative process, if possible, with all of its means available for input into that decision.[2] Only failing that alternative should this court seek to make that determination. It should be noted in this regard that of the 28 states cited by Madison as having adopted comparative negligence, only three have done so by judicial action; the remaining 25 did so by legislation.

We therefore decline, at this time, to adopt the doctrine of comparative negligence.

We find no error in either of these appeals and therefore affirm on both of them.

AFFIRMED.

Illustration to follow.

**2.** Our decision could not be limited to whether to adopt comparative negligence. If we opted for its adoption, it would still be necessary to adopt a form of it, from at least three now recognized by other jurisdictions. *See Am. Jur.2d New Topic Service, supra,* at 12–19.

N

EAST 20TH ST.

FREEMAN DECORATING COMPANY

OVERHEAD LIGHT

OVERHEAD LIGHT

FLASHING LIGHT CROSSING

OVERHEAD LIGHT

OVERHEAD LIGHT

OVERHEAD LIGHT

OVERHEAD LIGHT

FLASHING LIGHT SIGNAL