Rickie Dean GAIL, Janet Gail, Amanda Kay Gail, by her next friend, Rickie Dean Gail, and Neal Bryan Gail, by his next friend, Rickie Dean Gail, Appellees,

v.

Ronald Roland CLARK, a/k/a Ronald Roland Heslop, a/k/a Ronald Roland Helsop, and 7–Eleven Stores, Defendants,

and Western Convenience Stores, Appellant.

No. 86–493.

Supreme Court of Iowa.

July 22, 1987.

Rehearing Denied Aug. 18, 1987.

Raymond R. Stefani and Raymond R. Stefani II of Gray, Stefani & Mitvalsky, Cedar Rapids, for appellant.

Roxanne Barton Conlin and Dennis P. Ogden of James, Galligan and Conlin, P.C., Des Moines, for appellees.

Considered by REYNOLDSON, C.J., and HARRIS, LARSON, SCHULTZ, and LAVORATO, JJ.

LAVORATO, Justice.

In this personal injury action the district court entered judgment, based on a jury's verdict, against the defendant, Western Convenience Stores (Western). Western now appeals and raises a number of issues for our consideration. Western asserts the

district court erred in overruling its various pretrial and in-course-of-trial motions predicated on the fireman's rule and the assumption of risk defense. Western also asserts the court erred in submitting loss of consortium claims, in failing to give a requested perjury instruction, in refusing to allow settlement evidence, and in overruling its objections to expert testimony. Finally, Western challenges the damages as excessive and unsupported by the evidence and argues the district court should have ordered a new trial or, in the alternative, a remittitur. We affirm the judgment of the district court.

The jury could have found the following facts. The chain of events leading to the tragic truck-auto collision giving rise to this lawsuit began between 10:00 and 10:30 p.m. on September 12, 1981. At that time Ronald Roland Clark drove his red Dodge "L'il Red Express" pickup to First Avenue in downtown Cedar Rapids. Clark had been drinking throughout the day. After arriving at First Avenue, his first destination was the Western Convenience Store located at First Street and First Avenue. There, in an intoxicated condition, Clark purchased a cold 12–pack of beer.

After purchasing the beer, Clark continued his drinking throughout the evening and into the early morning hours of September 13, while cruising up and down First Avenue. He was joined in his travels by a young man and various young women who corroborated his drinking and intoxicated condition. During the course of the evening, Clark also purchased beer at a 7–Eleven store located in the city.

In the early morning hours of September 13, Clark again purchased a 12–pack of beer from Western. He still was in an intoxicated condition when he made this purchase.

Shortly after this last purchase, Clark engaged a driver of a GTO in a drag race that started on Collins Road in the northeast part of the city. During the race, Clark, together with a male and two female companions, occupied the front seat of the pickup.

As the pickup and GTO raced down Collins Road, two on-duty Cedar Rapids police officers spotted them and immediately gave pursuit. Responding to the flashing red lights and siren of the pursuing police vehicle, the driver of the GTO stopped, but Clark chose to elude apprehension. The chase continued through a northeast residential area of Cedar Rapids at speeds in excess of eighty miles an hour.

The officers requested assistance. Other law enforcement personnel responded. One of those responding was a deputy sheriff, who was nearly struck by Clark's pickup.

Shortly before 4 a.m., Clark and the pursuing officers reached Daniels Street. While Clark raced southbound on Daniels Street, another Cedar Rapids police squad car was traveling east on H Avenue, moving slowly into the intersection with red lights flashing. A stop sign was located on the northwest corner of the intersection, controlling traffic traveling southbound on Daniels Street, the direction Clark was traveling. Officer Rickie Gail was at the wheel of this squad car. He and his partner were responding to the request for assistance in the high-speed chase. Unable to stop, Clark drove his pickup at a high speed into the driver's side of Officer Gail's squad car.

The force of the collision caused the pickup to leave the road and to career through a yard and chain-link fence. The pickup came to rest embedded in the porch of a house to the south and east of the intersection. Officer Gail's squad car came to rest seventy feet south of the intersection at a right angle to his direction of travel. Officer Gail suffered severe, disabling injuries as a result of the collision.

Thereafter, Officer Gail and his wife, Janet Gail, brought this action against Clark, Western, and 7–Eleven Stores, alleging negligence and intentional misconduct against Clark and a dramshop violation against Western and 7–Eleven Stores. Officer Gail requested damages for his injuries, and his wife requested damages for lost consortium.

Western's answer generally denied the Gails' allegations, raised an affirmative defense of contributory negligence against Rickie Gail, and alleged Clark's actions were the sole proximate cause of the collision.

Clark's answer was a general denial of the petition's allegations. The defendant 7–Eleven Stores also filed an answer generally denying the allegations of the petition. It also raised contributory negligence and assumption of risk as defenses.

■ While the case was pending, we decided *Pottebaum v. Hinds*, 347 N.W.2d 642, 645, 647 (Iowa 1984), in which we adopted the fireman's rule [1] and applied it to dramshop actions. Relying on *Pottebaum*, 7–Eleven Stores filed a summary judgment motion invoking the fireman's rule to the facts of this case. Western followed suit with its own motion for summary judgment predicated on the applicability of the fireman's rule.

The district court, the Honorable Ansel J. Chapman presiding, overruled both motions. The court ruled, as a matter of law, that the fireman's rule did not apply because Officer Gail's presence at the scene was due to the high-speed chase and not to the indirect dramshop violation.

Thereafter, the Gails amended their petition by adding their two minor children as parties and asserting on the children's behalf claims for loss of means of support and services of their father.

Prior to trial, Clark and the 7–Eleven Stores settled with the Gails. The case proceeded to trial against Western only.

The district court, the Honorable William R. Eads presiding, denied motions for directed verdict, Iowa R.Civ.P. 216, and the jury returned a verdict against Western. The court entered judgments as follows: $1,161,000 in favor of Rickie Gail, which amount included $5000 for each of the two minor children for loss of parental consortium, and $100,000 in favor of Janet Gail for loss of spousal consortium. The court

then sustained Western's application for pro tanto credit, and set off against the $1,161,000 judgment the amount of the pretrial settlements from Clark and the 7–Eleven Stores totaling $311,570. Finally, the court denied motions for judgment notwithstanding the verdict, Iowa R.Civ.P. 243, for new trial, Iowa R.Civ.P. 244, and for remittitur, *see* Iowa R.Civ.P. 244, 250.

Additional facts will be discussed in connection with the issues to which they relate.

### I. *Fireman's Rule.*

Shortly after our decision in *Pottebaum v. Hinds*, 347 N.W.2d 642 (Iowa 1984), Western moved for summary judgment asserting that the fireman's rule applied to bar recovery by Rickie and Janet Gail. The district court overruled the motion, holding that the rule did not apply to the undisputed facts presented to the court.

During trial, Western moved to amend to conform to the proof, *see* Iowa R.Civ.P. 106, again asserting the fireman's rule as an affirmative defense. Relying on the summary judgment ruling, the court overruled the motion.

At the close of the plaintiffs' evidence and again at the close of all the evidence, Western moved for directed verdict, *see* Iowa R.Civ.P. 216, asserting that the fireman's rule, as a matter of law, applied to bar recovery by the plaintiffs. The court overruled both motions.

Western assigns these rulings as error. The question confronting us is whether the facts here are sufficiently different than those in *Pottebaum* to enable us to hold, as a matter of law, that our narrow formulation of the fireman's rule does not apply. We think they are.

In *Pottebaum* two police officers filed a dramshop action against a tavern operator, seeking damages for injuries they sustained when an intoxicated patron assaulted them while the officers were attempting to quell a disturbance in the defendant's

1. The rule denies recovery for a firefighter or policeman when the cause of action is based on the same conduct that initially created the

need for the officer's presence in his or her official capacity.

tavern. In a motion for judgment on the pleadings, the defendant asserted the fireman's rule barred the officers from recovering for injuries sustained while acting in their official capacity. The district court denied the motions, ruling that Iowa had not adopted the rule nor applied it to a dramshop action. *Pottebaum*, 347 N.W.2d at 643. We reversed and adopted what we termed a limited rule:

> Regardless of the rationale invoked to support the rule, courts almost universally recognize that neither a fireman nor a policeman can recover when their complaint is based on the same conduct that initially created the need for the officer's presence in his official capacity.
>
> While we do not ascribe to all of the various policy reasons espoused in support of the fireman's rule, we believe adoption of a limited rule is sound.

*Pottebaum*, 347 N.W.2d at 645 (citations omitted). We went on to hold that the rule applies to a dramshop action when the violation of the dramshop statute is also the act that created the need for the officer's presence. *Id.* at 647.

We did not base the rule on the status of the injured party because to do so "would seem to unfairly limit the rule's application to the landowner/occupant context, thus denying liability for negligent acts of these individuals but not for others whose negligent acts injure police officers or firemen elsewhere." *Pottebaum*, 347 N.W.2d at 645. In leaving the door open for recovery we said:

> This is not to say that firemen or police officers are barred from recovery in all instances in which they are injured by negligent acts. The relevant inquiry is whether the negligently created risk which resulted in the fireman's or policeman's injury was the very reason for his presence on the scene in his professional capacity. If the answer is yes, then recovery is barred; if no, recovery may be had.

*Id.* at 646. More specifically, we pointed out that if an officer is injured by an intoxicated patron *when the officer is performing a law enforcement activity unrelated to a violation of the dramshop statute*, the rule would not bar recovery. *Pottebaum*, 347 N.W.2d at 647–48.

Several policy considerations played an important role in our determination of the scope of the rule. We sought to avoid any detrimental effect to public safety that might result from a citizen's unwillingness to call upon police or firefighters because of potential liability resulting from a condition the citizen may have negligently created. Moreover, we recognized that a citizen may have a legal duty in some instances to summon police or firefighters. Imposing liability upon a citizen in discharging that duty seemed to us inconsistent and unfair. *Pottebaum*, 347 N.W.2d at 645.

We are convinced we do not offend these policy considerations by permitting liability under the facts here for the reasons given in the district court's summary judgment ruling:

> [Applying *Pottebaum* ] to the facts in the present case would be a quantum extension of the rule; it would no longer be a "narrow formulation" of a "limited rule." In the present case the defendant did not call the police.... The main act that created the need for Gail's presence was the high-speed chase and not the indirect dramshop violation. Gail's presence at the scene of the accident was one step removed from defendant's dramshop conduct—it was the high-speed chase which placed him in danger without having any reason to connect the other driver's conduct with defendant's business operation. From a public policy standpoint alone I see no reason why a policeman injured on the public highway, in the performance of his duty, by a negligent motorist has any less right of recovery under the dramshop act than a person who is not a policeman.

Clearly, Officer Gail was injured in performing a law enforcement activity unrelated to a violation of the dramshop statute, a situation we recognized as affording a police officer protection under the dramshop statute. *Pottebaum*, 347 N.W.2d at 647–48.

The district court was correct in overruling the motions for summary judgment, for leave to amend to conform to proof, and for directed verdict as they relate to the fireman's rule.

## II. *Assumption of Risk.*

Western attempted to interject assumption of risk into the case before trial by its motion to amend answer, *see* Iowa R.Civ.P. 88, and during trial by its motion to conform to proof, *see* Iowa R.Civ.P. 106. Both motions were overruled as being untimely. Western also assigns these rulings as error.

Our holding as to the merits of the defense as applied to the facts here obviates our need to discuss the timeliness issue.

It is true we have recognized assumption of risk as a defense to a dramshop action even though the action is in the nature of strict liability. *See Berge v. Harris,* 170 N.W.2d 621, 627 (Iowa 1969) (fact that Dramshop Act imposes strict liability does not prevent defendant from raising assumption of risk as a defense); *see also Gremmel v. Junnie's Lounge, Ltd.,* 397 N.W.2d 717, 720 (Iowa 1986); *Martin v. Heddinger,* 373 N.W.2d 486, 488 (Iowa 1985); *Rippel v. J.H.M. of Waterloo, Inc.,* 328 N.W.2d 499, 501 (Iowa 1983). However, our rationale for allowing assumption of risk as a defense to a dramshop action is a recognition of the fact that the right to recover under the dramshop statute is limited to innocent persons. *Berge,* 170 N.W.2d at 625. We have held that one who knowingly and willingly rides with a drunken driver, *see Martin,* 373 N.W.2d at 489; *Berge,* 170 N.W.2d at 627, or who mutually assents to combat with a person he believes to be intoxicated, *see Gremmel,* 397 N.W.2d at 720, is not an innocent person entitled to protection under the dramshop statute.

■ Under the record we could hardly classify Officer Gail as anyone other than an innocent person. He was injured in the course of carrying out his official duties without any knowledge that the individual involved in the high-speed chase was intoxicated as a result of a dramshop violation.

We therefore hold, as a matter of law, that the assumption of risk defense does not apply here. Accordingly, the district court did not err in overruling the two motions.

## III. *Loss of Consortium Claims.*

Iowa Code section 123.92 (1985) provides in part:

> Every husband, wife, child ... who shall be *injured in person or property or means of support* by any intoxicated person, or resulting from the intoxication of any such person, shall have a right of action ... against any licensee or permittee, who shall sell ... any beer ... to any such person while the person is intoxicated, or serve any such person to a point where such person is intoxicated, for all damages actually sustained.

(Emphasis added.) Western asserts the language "injured in person or property or means of support" is not broad enough to encompass Janet's spousal consortium claim and the minor children's parental consortium claims. Western's fall back position is that there was not substantial evidence to submit the claims. For these reasons, Western argues the district court erred in not sustaining its motions for directed verdict as to these consortium claims.

The Gails, on the other hand, argue that our case law has consistently considered consortium claims as property rights; therefore, we should consider these claims as injuries to property for purposes of section 123.92. Additionally, the Gails dispute Western's fallback position that there was not substantial evidence to submit the claims.

■ A. *Injured in property.* Spousal consortium is the fellowship of husband and wife and the right of each to the intangible benefits of company, cooperation, affection, and aid of the other in every marital relationship. Spousal consortium also includes the tangible benefits of general usefulness, industry, and attention within the home and family. It does not include loss of monetary support from the injured spouse. *Madison v. Colby,* 348 N.W.2d

202, 208 (Iowa 1984); *Audubon-Exira Ready Mix, Inc. v. Illinois Central Gulf R.R.*, 335 N.W.2d 148, 151–52 (Iowa 1983); 1 Iowa Uniform Jury Instructions 3.17 (1984).

■ Parental consortium, on the other hand, is the relationship between parent and child and the right of the child to the intangible benefits of companionship, comfort, guidance, affection, and aid of the parent in every parental relationship. Similar to spousal consortium, parental consortium also includes the tangible benefits of general usefulness, industry, and attention within the home and family, but does not include the value of tangible contribution or loss of monetary support from the injured parent. *Madison*, 348 N.W.2d at 208; *Audubon-Exira*, 335 N.W.2d at 151–52; 1 Iowa Uniform Jury Instructions 3.12 (1984).

The intangible benefit element is the "sentimental" version of consortium while the tangible benefit factor is the "material" or "practical" element of consortium which includes services:

> "Consortium" at common law included not only conjugal fellowship of husband and wife but also service as a prominent, if not the dominant, factor; not so much the service resulting in the performance of labor or the earning of wages, as the service which contributed and assisted in all the relations of domestic life. This concept of the term became known as the "material" or "practical" version. As the attitude of the courts toward the status of husband and wife, one to the other, changed, a more modern and limited version thereof was adopted by various jurisdictions. Under it the term "consortium" was limited to "the right which husband and wife have to each other's society, comfort, and affection".... This Court has defined it as "conjugal fellowship of husband and wife; and the right of each to the company, cooperation, affection and aid of the other in every conjugal relation."

*Acuff v. Schmit*, 248 Iowa 272, 274, 78 N.W.2d 480, 481–82 (Iowa 1957) (citations omitted) (recognizing for the first time a wife's right to loss of consortium due to negligent injury of husband). Prior to *Audubon-Exira* and *Madison*, neither spousal consortium, *see Acuff v. Schmit*, 248 Iowa at 274, 78 N.W.2d at 481–82, nor parental consortium, *see Weitl v. Moes*, 311 N.W.2d 259, 263–65 (Iowa 1981) (plurality opinion) (child's claim for loss of parental consortium first recognized), included the service element. *Audubon-Exira*, a spousal wrongful death case, was our first binding precedent combining the sentimental and service elements of consortium. *Audubon-Exira*, 335 N.W.2d at 151–52. We reaffirmed this combination in *Madison*, 348 N.W.2d at 209, a spousal injury case. We also made clear in *Madison* that in spousal injury cases, the deprived spouse, not the injured person, has the right to sue and recover for loss of spousal consortium. *Id.* As to a child's claim for loss of parental consortium in such cases, we reaffirmed our holding in *Audubon-Exira*, 335 N.W.2d at 152, that the injured parent has the right to sue on behalf of the child but the recovery belongs to the child. *Madison*, 348 N.W.2d at 208. Finally, we said that both consortium claims must be joined with the injured person's action whenever feasible. *Id.* at 209.

In *Fraternal Order of Eagles v. Illinois Casualty Co.*, 364 N.W.2d 218, 222 (Iowa 1985), we held that the language "injured in person" of section 123.92 refers to bodily injury and did not include a parent's claim for loss of a child's consortium under Iowa Rule of Civil Procedure 8.[2] We specifically left open the question whether the words "injured in property" encompass a rule 8 claim. *Id.* at 222. In doing so, we noted *Hastings v. James River Aerie No. 2337—Fraternal Order of Eagles*, 246 N.W.2d 747, 749 (N.D.1976), which held that a wife who has lost her husband's consortium is "injured in property" within the meaning of North Dakota's dramshop act. We

---

**2.** Rule 8 provides:

"A parent, or the parents, may sue for the expense and actual loss of services, companionship and society resulting from injury to or death of a minor child."

pointed out that North Dakota's dramshop statute, like Iowa's, is phrased in terms of persons "injured in person, property, or means of support." *Fraternal Order of Eagles*, 364 N.W.2d at 222 n. 4.

Relying on the common-law recognition of a husband's right to recover for the loss of his wife's consortium, the *Hastings* court concluded that a *right* of consortium is *property* under its dramshop statute. *Hastings*, 246 N.W.2d at 749 (relying on *Foot v. Card*, 58 Conn. 1, 18 A. 1027, 1028 (1889) and 3 W. Blackstone, Commentaries 143). As further support for this common-law recognition, the court cited an earlier Iowa case, *Price v. Price*, 91 Iowa 693, 698, 60 N.W. 202, 203 (1894) (statutory provision authorizing wife to sue for loss of consortium in alienation of affection cases). *Hastings*, 246 N.W.2d at 749.

In *Price* we recognized that since time immemorial the law has regarded spousal consortium as a valuable property right. *Price*, 91 Iowa at 697, 60 N.W. at 203 (1894) (citing *Foot v. Card*, 58 Conn. 1, 18 A. 1027, 1028 (1889)). Since *Price* we have consistently said so. *See, e.g., Madison v. Colby*, 348 N.W.2d at 206 (quoting *Price*, 91 Iowa at 698, 60 N.W. at 203); *Fuller v. Buhrow*, 292 N.W.2d 672, 675 (Iowa 1980) ("This contention by defendant [spouse has no separate and distinct damage by virtue of his or her loss of consortium] is contradicted by decisions of this court that have recognized that consortium is a separate property right of each spouse to the marital relationship."); *Lampe v. Lagomarcino-Grupe Co.*, 251 Iowa 204, 206, 100 N.W.2d 1, 2 (1959) ("In this state consortium is deemed to be a property right."); *Acuff v. Schmit*, 248 Iowa at 278, 78 N.W.2d at 484 (quoting *Price*, 91 Iowa at 698, 60 N.W. at 203) (recognizing common-law right in either spouse to sue for loss of consortium).

Similarly, we have recognized that a parent's right to a child's consortium and a child's reciprocal right to parental consortium are valuable property rights entitled to protection. *Madison*, 348 N.W.2d at 206.

■ The words "injured in property" have appeared in our dramshop statute since its first enactment in 1862. Because consortium has always been considered a property right at common law, we may certainly presume the legislature intended to carry over that meaning into the dramshop statute when it used the words "injured in property." Moreover, we find nothing in our decisions interpreting the statute, nor in the language of the statute itself suggesting any legal or policy reason to distinguish consortium from any other property right. We therefore conclude a husband's or wife's right to spousal consortium and a child's right to parental consortium are property under section 123.92; the district court was correct in overruling the directed verdict motions based on Western's assertion to the contrary.

Western's reliance on language in *Haafke v. Mitchell*, 347 N.W.2d 381, 389 (Iowa 1984), is misplaced. We held there that the district court was correct in striking a claim for damages for "grief, mental anguish, remorse and humiliation" resulting from the death of a child. We properly pointed out that these elements are not encompassed in the term "services" in section 613.15, our statute on wrongful death. *Haafke*, 347 N.W.2d at 389.

In reaching a conclusion that these elements were likewise not recoverable under section 123.92, we used the following language relied on by Western: "The general rule appears to be in accord, that claims for mental anguish, disgrace, and *loss of companionship* are not provided for by dram shop acts couched in terms of injury to person, property, or means of support, as is Iowa's. *See* Annot., 78 A.L.R.3d 1199, 1201–1203 (1977)." *Haafke*, 347 N.W.2d at 389. (emphasis added). The language "loss of companionship" was gratuitous because the plaintiffs were not making a rule 8 claim. Moreover, the cited A.L.R. annotation lists only two cases denying loss of consortium: *State Farm Mut. Auto. Ins. Co. v. Village of Isle*, 265 Minn. 360, 369, 122 N.W.2d 36, 42 (1963) and *Mulford v. Clewell*, 21 Ohio St. 191, 196 (1871). *See* Annotation, *Recovery Under Civil Damage (Dram Shop) Act for Intangibles such as Mental Anguish, Em-*

*barrassment, Loss of Affection or Companionship, or the Like,* 78 A.L.R.3d 1199, 1207 (1977). Both cases were decided adversely to the plaintiffs because loss of consortium was held not to be an injury to the person. The Minnesota court gave an additional ground: it did not recognize a wife's loss of consortium. *Isle,* 122 N.W.2d at 41–42. Neither case considered whether loss of consortium could be an injury to property. A subsequent Minnesota case, relied on by Western, denied recovery for a wife's claim for loss of consortium under a current version of Minnesota's dramshop statute without any analysis. *See Clemas v. Northern States Enters., Inc.,* 361 N.W.2d 149, 151 (Minn.1985). In any event, to the extent that *Haafke v. Mitchell* is inconsistent with the conclusions we reach here, it is hereby overruled.

B. *Substantial evidence to support submission of consortium claims.* Western points to the testimony of Rickie Gail's treating psychiatrist, Dr. Thomas Hansen, to support its contention that there was no diminution in the consortium of Rickie's spousal and parental relationships. Western also relies on Janet Gail's testimony that the marriage improved after the collision. Consequently, Western argues the district court erred in not sustaining, as to the consortium claims, its motion for directed verdict made at the close of plaintiff's evidence and renewed at the close of all the evidence.

In division VII we discuss the evidence we believe supports the jury awards for the consortium claims. The same evidence justified submission of the claims to the jury in the first instance. Accordingly, we give no further consideration to this assigned error except to say that the district court was correct in overruling the directed verdict motions.

IV. *Perjury Instruction.*

During the course of cross-examination by Western's attorney, Clark testified his testimony in a previous deposition was not true. In the deposition, Clark denied drinking alcoholic beverages throughout the day of September 12. On a point critical to Western's defense, Clark claimed in his deposition that he purchased only one 12–pack of beer from Western during the evening of September 12 and another from a 7–Eleven store during the early morning hours of September 13. He opined he was not intoxicated when he purchased the second 12–pack and the beer he consumed before the collision had no effect on his driving.

In contrast, at trial Clark testified he had been drinking throughout the day with a friend and was intoxicated when he purchased a 12–pack of beer at Western during the evening of September 12. He further testified that he purchased a second 12–pack of beer at a 7–Eleven store during the course of the evening and a third 12–pack at Western during the early morning hours of September 13. He opined that from the time he arrived in downtown Cedar Rapids during the evening of September 12 until the collision, there was no time that he was not intoxicated.

Western cross-examined Clark at length regarding these discrepancies in his testimony. Because of the change in testimony, Western submitted the following requested perjury instruction which was refused by the district court:

The law provides that a person commits perjury when he knowingly makes a false statement of material facts while under oath in a proceeding or other matter in which statements under oath are required.

The testimony of a person who commits perjury should always be considered with caution and weighed with great care when considered with the other testimony presented.

Western argues the district court's refusal to give the requested instruction was error.

In reviewing instructions for error, we recognize the district court is free to phrase instructions in its own words so long as the instructions fully and fairly inform the jury of the issues and applicable law. *Clinton Land Co. v. M/S Assocs., Inc.,* 340 N.W.2d 232, 234 (Iowa 1983). Moreover, we must read and construe all instructions together, not piecemeal or in

artificial isolation. *Gremmel v. Junnie's Lounge, Ltd.*, 397 N.W.2d 717, 722 (Iowa 1986).

It is for the jury to assess the credibility of the witnesses. *Syester v. Banta*, 257 Iowa 613, 616, 133 N.W.2d 666, 668 (1965). To this end the district court gave the jury three stock instructions relating to (1) the jury's exclusive duty to assess the credibility of the witnesses, (2) the weight to be accorded the testimony of a witness who is impeached by prior inconsistent statements, and (3) the value of testimony with regard to verbal statements. *See* 1 Iowa Uniform Jury Instructions 1.5, 1.10, and 1.13.

In *Murphy v. Chicago, Great Western Ry. Co.*, 140 Iowa 332, 337–38, 118 N.W. 390, 392 (1908), the defendant objected to a credibility instruction because it did not "more specifically advise the jury as to the perjury of the plaintiff." *Id.* We found no error in the instruction because "[i]t carefully called the attention of the jury to the various elements which might properly be considered in weighing the testimony, and as affecting the credibility of the several witnesses, and this was sufficient." *Id.; accord Burger v. Omaha & C.B.St.Ry. Co.*, 139 Iowa 645, 655–56, 117 N.W. 35, 38–9 (1908) (defendant sought instruction relating to false testimony of witness).

█ In the present case, too, we believe the instructions given adequately advised the jury of its duty. We find no merit in this assignment of error.

### V. *Settlement Evidence.*

Approximately two years before the trial, Clark settled with the Gails for $60,570, and the Gails dismissed their claims against Clark. The settlement occurred approximately two months after Clark had given deposition testimony favorable to Western's defense.

During the trial and after Clark had retracted much of his deposition testimony, Western asked the court to have the jury hear the terms of the settlement agreement as part of its case. Western argued evidence of the settlement agreement was admissible pursuant to Iowa Rule of Evidence 408 to prove bias and prejudice on the part of Clark. Its theory was that Clark's trial testimony demonstrated an effort by him to help the Gails at a time when it would not expose him to liability.

The Gails objected on the grounds of relevancy and a violation of the collateral source rule. The district court sustained the objections and abided by its ruling after Western made an offer of proof of the terms of the settlement agreement. Western asserts the district court committed prejudicial error in excluding the evidence of Clark's settlement agreement with the Gails.

Iowa Rule of Evidence 408 [3] requires exclusion of evidence relating to compromise or offers to compromise if the evidence being introduced is used to prove liability for or invalidity of the claim. However, such evidence is admissible when offered to prove a fact other than liability. *Miller v. Component Homes, Inc.*, 356 N.W.2d 213, 215 (Iowa 1984); *Pogge v. Fullerton Lumber Co.*, 277 N.W.2d 916, 921 (Iowa 1979); *accord* Fed.R.Evid. 408; Iowa R.Evid. 408; *McCormick on Evidence* § 274, at 813 (3d ed. E. Cleary 1984); 31A C.J.S. *Evidence* § 286, at 734 (1964). The decision whether to admit such evidence for other purposes is committed to the discretion of the trial court. *Reichenbach v. Smith*, 528 F.2d 1072, 1075 (5th Cir.1976) ("The importance of informing the jurors fully so that they can carefully judge the credibility of each witness in making their fact determination may in some situations outweigh the desire to encourage settlements. But this choice must be made in the first instance by the trial judge."); *Soria v. Sierra Pac. Air-*

---

**3.** The rule provides in pertinent part:

Evidence of (1) ... offering ... or (2) accepting ... a valuable consideration in compromising ... a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.... This rule ... does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness....

*lines, Inc.,* 111 Idaho 594, 605, 726 P.2d 706, 717 (1986). We will reverse the trial court's determination on the issue of admissibility of evidence only when we find a clear abuse of discretion. *State v. Wilson,* 406 N.W.2d 442, 447 (Iowa 1987).

In *Stewart v. Madison,* 278 N.W.2d 284 (Iowa 1979), we were faced with a similar scenario. Stewart was injured in a collision between a car operated by Madison, in which Stewart was a passenger, and a train owned and operated by the Chicago and Northwestern Transportation Company. Stewart sued Madison and the railroad but settled with Madison prior to trial. The railroad sought to impeach Stewart with evidence of his settlement with Madison. Evidence of the settlement was offered as "bearing upon the change of the story of Stewart as to the amount of drinking Madison had done." *Id.* at 293.

In holding that the district court properly restricted evidence of the settlement, we said:

> The court did not limit defendant's right to impeach Stewart on the basis of prior inconsistent statements; in fact it specifically ruled that this could be done. Inquiry as to prior inconsistent statements, if any, was permitted by the trial court; it just did not permit evidence as to the *reasons* for such inconsistencies. *Although this latitude might be proper as to other areas of impeachment, it runs head-on in this case with the strong policy considerations favoring settlements and discouraging their use in a manner which might place a chill on settlements or settlement attempts.* Under these circumstances it was not error to restrict evidence of the settlement in the manner of the trial court.

*Id.* at 293 (citation omitted) (emphasis added except as to the word "reasons"); *see also* 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 408[05], at 408–31 (1986) (trial judge should weigh need for such evidence against the potentiality of discouraging future settlement negotiations).

As in *Stewart,* the district court did not limit Western's right to impeach Clark on the basis of prior inconsistent statements;

it just did not permit evidence as to the reasons for such inconsistencies. The record clearly shows that Western made full use of its opportunity to impeach Clark with his prior inconsistent statements.

We note from Western's offer of proof a reason in addition to the policy considerations stated in *Stewart* for restricting the evidence of the settlement agreement in this case. Western sought to have the jury informed of the *amount* of settlement with Clark. Such a disclosure could have substantially prejudiced the Gails. A danger existed that the jury would have considered the amount of settlement in its award to the Gails. Even relevant evidence may be excluded when its probative value is substantially outweighed by prejudice to the opposing party, confusion of issues, or considerations of waste of time. *State v. Scott,* 405 N.W.2d 829, 833 (Iowa 1987); *Carter v. MacMillan Oil Co.,* 355 N.W.2d 52, 55 (Iowa 1984); Iowa R.Evid. 403. For example, in *Frey v. Snelgrove,* 269 N.W.2d 918, 923 (Minn.1978), the court held that the details of a release agreement may, in the discretion of the trial court, be admissible under rule 408 of the Rules of Evidence when offered to prove bias or prejudice of a witness. However, it cautioned that

> as a general rule the amount paid in settlement should never be submitted. That figure itself may have little relation to the actual damages of a plaintiff, since it may reflect a compromise, the evaluation of a defendant's potential liability, and many other factors not relevant to a jury's consideration of actual monetary damages.

*Id.*

■ In accord with our reasoning in *Stewart* and because the evidence of the amount of settlement would have presented a danger of substantial prejudice to the Gails, we hold that the district court did not abuse its discretion in excluding evidence of Clark's settlement agreement with the Gails.

## VI. *Expert Testimony.*

The Gails presented opinion evidence from Dr. Donald Zavala that Rickie was

totally disabled as a police officer. Western asserts the district court abused its discretion in allowing Dr. Zavala's opinion over its lack-of-qualification objection because the doctor was not sufficiently qualified to give such an opinion. Western's assertion is based upon the doctor's admission that he did not know the specific standards and requirements set by the Cedar Rapids Police Department for a police officer and the specific duties required of such an officer.

The admission of expert testimony rests in the discretion of the district court, and we will not reverse its decision absent manifest abuse of that discretion. *DeBurkarte v. Louvar*, 393 N.W.2d 131, 138 (Iowa 1986). Once a witness has expressed enough knowledge of the subject to entitle his or her opinion to go to the jury, the question of the degree of the witness's knowledge goes to the weight of the evidence rather than to its admissibility. *Schmitt v. Jenkins Truck Lines, Inc.*, 170 N.W.2d 632, 651 (Iowa 1969).

The evidence shows that Dr. Zavala is a University of Iowa professor of pulmonary medicine, specializing in pulmonary function testing and pulmonary disease. He testified that police and fire departments across the state have called upon him to evaluate police officers and firefighters for limitations in their jobs. He further testified that for the past seventeen years he has performed an average of one evaluation per month similar to the test he performed on Rickie Gail.

Dr. Zavala evaluated Rickie at the request of the Cedar Rapids Police Department. The doctor testified he had a general idea of the duties and responsibilities of a police officer. At this point the court sustained Western's lack-of-qualification objection on the ground that the doctor had not stated what "his general understanding of the duties are."

Thereafter, the doctor testified to a detailed history given to him by Rickie as to his duties as a police officer. The doctor also described in detail his understanding of a police officer's duties. Finally, the doctor testified the police and fire departments that have sought and relied on his disability evaluations have never given him a list of specific duties. With this additional evidence, the district court, over Western's renewed objection, allowed the doctor to render an opinion that Rickie was not capable of performing his duties as a police officer.

█ We are convinced from the record presented that Dr. Zavala disclosed sufficient knowledge to allow his opinion to be heard by the jury. The district court did not abuse its discretion in allowing the opinion.

VII. *Damages.*

The jury awarded Rickie $1,161,000 which included $5000 for each of the two minor children for loss of parental consortium. It also awarded Janet $100,000 for loss of spousal consortium. The court then sustained Western's posttrial application for pro tanto credit, and set off against the $1,161,000 judgment the amount of the pretrial settlements from Clark and the 7–Eleven Stores totaling $311,570.

Western contends because the verdicts are excessive and without evidentiary support we should order a retrial or, at least, order a remittitur to a proper amount. We may set aside or alter an award that is flagrantly excessive or unsupported by the evidence. *DeBurkarte v. Louvar*, 393 N.W.2d 131, 139 (Iowa 1986).

█ Viewing the evidence in the light most favorable to the plaintiffs, *id.* at 139, we conclude the verdicts, although generous, are not excessive, and are supported by substantial evidence.

As a result of the collision, Rickie Gail suffered a crushing injury to his chest. Because of eight fractured ribs on the left and a fracture of the left clavicle, his chest wall was unstable and free-floating. In addition he suffered a large contusion of the left lung, resulting in its collapse; a laceration of the scalp; and a severe head concussion.

Rickie was comatose for forty-eight hours and near death several times. He was in intensive care approximately three

and one-half weeks during which time he developed blood clots in his right leg that traveled to his lung. During his stay in intensive care, he developed pneumonia and stress-related bleeding ulcers.

Because he was not able to breathe adequately, doctors inserted a polyvinyl tube down Rickie's throat and through his windpipe. The tube was attached to a ventilator to breathe for him. Rickie was given medication to paralyze him so he would not move and interfere with the mechanical breathing process. The tube remained in place approximately three and one-half weeks. He was treated with numerous medications to help his breathing and to treat the blood clots, pneumonia, ulcers, and head injury. He was released from the hospital on October 19, 1981.

Before the collision, Rickie was a robust and self-sufficient individual. He and his wife, Janet, enjoyed going on picnics, playing volleyball, and visiting friends. He did all the ordinary but useful chores around the home, such as mowing the lawn, shoveling snow, and making needed repairs. He and Janet shared all the decision-making responsibilities and enjoyed an active sex life.

Rickie's relationship with his minor daughter, Amanda, before the collision was very close and loving. He played ball with her and took her sledding.

After the collision, Rickie went into a deep depression because of the severe head injury he sustained. He hallucinated and became depersonalized in the sense that he was out of touch with reality. Try as he could, he was not able to remember the details of the accident, a condition that has remained with him. He stayed in his room for long periods of time, becoming so dependent upon Janet that she had to feed him. He became very irritable with Janet, complaining about everything she did. Being in the company of people frightened him. His relationship with his daughter became very strained because he could not spend any time with her.

Rickie was present at the birth of his daughter, but because of his depression missed the birth of his son, Neal, thereby depriving Janet of critically needed support. Although the birth of his son together with psychiatric treatment and medication brought Rickie out of his depression, he could not give Janet any help with the baby's care. Because of his weakened condition, Rickie would not hold the baby, fearing he would drop the child.

Rickie was medically released to return to his duties as a patrol officer in June 1982, some nine months after the collision. However, several months prior to this time, Rickie began developing bronchial asthma, which became progressively worse. His doctors attribute this condition to the extensive lung injury, the prolonged use of the ventilator, and the pneumonia he suffered during his hospital stay, all of which resulted in his lungs being scarred. Extreme humidity and cold exacerbate the bronchial asthma.

Because of his injuries, Rickie has a circulatory and ventilatory impairment, resulting in a severely limited breathing capacity. For example, his capacity to exercise is limited to a stroll at one and one-half miles per hour. Any attempts at exercise beyond this limit will cause him to collapse. The condition will become progressively worse as he gets older. In addition, he will need some form of medication for the rest of his life.

Rickie's condition deteriorated to the point that he was not able to physically perform his duties as a patrol officer. As a result he was involuntarily retired on March 19, 1985, at the age of twenty-nine, based upon his doctor's medical opinion of disability.

The evidence shows that Rickie's lifelong dream was to become a police officer. Numerous commendations for excellent police work attest to the fact he loved his work and was an excellent police officer. He is now limited to sedentary work. Lifting is limited to ten pounds. He is contemplating a new career as a minister in a religious denomination in which his father is a minister. The evidence shows that the income from this profession is considerably less than Rickie earned as a police officer.

Because of Rickie's limited breathing capacity, the couple's sex life is very limited. Moreover, all the decision-making responsibilities and household chores are left to Janet. She has learned to take care of everything without bothering Rickie.

Rickie's disability has also severely limited his activities with his two children. He has no stamina to play ball with Amanda or to take her sled riding. His young son can outwrestle Rickie on the floor. Moreover, Rickie must refuse the young boy's insistence to take him bike riding.

Medical expenses attributable to Rickie's injuries were approximately $40,000; his loss of wages amounted to approximately $11,000. There was evidence from which the jury could find an impairment of earning capacity in excess of $400,000. There was also evidence of considerable pain and suffering which Rickie was still experiencing at the time of trial. The evidence would support a finding that the pain and suffering and disability will extend over a life expectancy of 44.16 years.

We are convinced this evidence of the injury and resulting pain and suffering and disability, which we have chronicled, support the jury's award of $1,151,000 to him. We are also convinced the evidence we have detailed concerning the consortium claims supports the jury's award of $5000 for each of the two children and $100,000 for Janet. In reaching these conclusions we are reminded of an earlier pronouncement of this court which has particular application here: "The assessment of damages is traditionally a jury function and courts intervene only for compelling reasons. Where a verdict is within the evidence we will not disturb the jury's award." *Haumersen v. Ford Motor Co.,* 257 N.W.2d 7, 16 (Iowa 1977).

Finding no error, we affirm the judgment of the district court.

AFFIRMED.