# IN THE COURT OF APPEALS OF IOWA

No. 15-0519
Filed August 16, 2017

**LUIS GUZMAN-PEREZ,**
       Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
       Respondent-Appellee.
_____

Appeal from the Iowa District Court for Linn County, Mitchell E. Turner, Judge.

The applicant appeals the district court decision denying his request for postconviction relief from his conviction for second-degree murder. **AFFIRMED.**

Mark C. Meyer, Cedar Rapids, for appellant.

Luis Guzman Perez, Anamosa, appellant pro se.

Thomas J. Miller, Attorney General, and Darrel L. Mullins, Assistant Attorney General, for appellee State.

Considered by Doyle, P.J., McDonald, J., and Goodhue, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2017).

**GOODHUE, Senior Judge.**

Luis A. Guzman-Perez appeals from the denial of his request for postconviction relief, claiming he received ineffective assistance of counsel during the trial that led to his second-degree-murder conviction. We affirm.

## I. Background Proceedings

We can hardly do better than to set out in full the trial courts well-written, well-reasoned, and comprehensive findings of fact, conclusions of law and ruling, but in the interest of brevity, we will attempt to set out the pertinent parts of it in an abbreviated fashion. Guzman-Perez was arrested on October 14, 2006, and charged with first-degree murder. The trial began on February 4, 2008, and the jury returned a verdict of guilty of second-degree murder on February 14, 2008. Guzman-Perez's post-trial motions were denied, and Guzman-Perez appealed.

On appeal, counsel moved to withdraw and dismiss after concluding there were no non-frivolous claims. The supreme court remanded the matter for the trial court to apply the weight-of-the-evidence standard to Guzman-Perez's motion for a new trial. The district court reaffirmed its ruling after applying the weight-of-the-evidence standard. The supreme court then dismissed the appeal as frivolous but preserved any ineffective-assistance-of-counsel claims for a postconviction (PCR) proceeding. Guzman-Perez filed this PCR proceeding, claiming ineffective assistance of counsel and asking that the verdict be set aside and the matter remanded for a new trial. The relief requested was denied by the trial court.

## II.     Background Facts

On October 14, 2006, Guzman-Perez and his girlfriend, Caitlin Woodruff, proceeded to a party in Tama County at approximately midnight. In addition to Woodruff, Guzman-Perez's friends, Ignacio Cruz, Salvador Cruz, Alejandro Lopez, Julio Rios, and Daniel Rodriquez-Alviz, accompanied him to the party. Both Guzman-Perez and Salvador Cruz were carrying handguns.

Apparently, alcoholic beverages were flowing freely at the party. Woodruff got in a fight with another woman; Guzman-Perez and Ignacio Cruz, along with the victim, Josh Wohlman, were involved in separating the women. Guzman-Perez and Woodruff proceeded to leave the party. As they were leaving, a fight developed between the group that came with Guzman-Perez and others at the party. It is unclear whether Guzman-Perez was initially involved in the fight or whether he was trying to break it up. In any event, Guzman-Perez and Salvador Cruz fired their pistols into the air. Woodruff tried to take the gun away from Guzman-Perez but she was unsuccessful and both of them fell to the ground. Guzman-Perez testified that soon thereafter, someone grabbed him around the neck from behind and Wohlman tackled him from the front. Several witnesses testified that Guzman-Perez was yelling at Wohlman.

Guzman-Perez testified that he hit the ground with Wohlman on top of him and the gun accidently went off, striking Wohlman in the forehead and killing him. Woodruff testified that Guzman-Perez was on his feet and Wohlman was getting up when the gun went off. Other eyewitnesses testified variously that Guzman-Perez was three to six feet away from Wohlman and Wohlman was trying to get up or was standing. Chelsey Wagg, the only witness to claim she had not been

drinking, testified that Guzman-Perez and Wohlman were facing each other when Guzman-Perez yelled, "I will shoot you." Other witnesses testified to Guzman-Perez's threat to shoot Wohlman. Rodriguez-Alviz originally told investigators that Guzman-Perez told him he was being choked so he pointed the revolver at Wohlman and "shot it." Rodriguez-Alviz told a different story at the PCR hearing. Witnesses testified that Guzman-Perez threatened to shoot Wohlman, pointed the gun at Wohlman, and fired.

Based on the stippling caused by unburnt powder surrounding Wohlman's wound, the State's forensic expert, Victor Murillo, testified that the muzzle of the gun could have been no more than one or two inches from the victim. Wohlman had sutures over the wound and Murillo, a forensic expert, testified that what he thought were stipplings could have been from a needlepoint trying to stitch Wohlman up. Murillo further testified that he had examined and tested the revolver Guzman-Perez used and it took from seven-and-a-half to seven-and-three-quarter pounds of pull on the trigger to make it fire. Witnesses on behalf of the State, as well as witnesses called by Guzman-Perez, gave testimony inconsistent with the statements that they had given to law enforcement taken immediately after the shooting and also inconsistent with their prior depositions, where depositions had been taken. There was no question that the bullet killing Wohlman came from Guzman-Perez's gun, but he always maintained the shooting was an accident when the gun discharged after he and the victim fell. When investigators interviewed the witnesses, none of them testified that the shooting had taken place when both men were on the ground. Guzman-Perez

immediately left the scene with some of his friends after the shooting incident, and someone threw the gun out of the window of the car on their way home.

At the time of arrest and booking, Guzman-Perez was wearing a black pea coat, a black/blue-and-white-striped sweatshirt/jersey, a white t-shirt, blue jeans, and green/white tennis shoes. The pea coat, the white t-shirt, blue jeans, and tennis shoes were all examined and taken by the Division of Criminal Investigation (DCI) lab for blood examination, but both of the DCI agents involved testified they never saw the striped sweatshirt.

The DCI agents also testified that they routinely do not take all clothing for testing. If an item has no evidentiary value, it is not taken. The testing of Guzman-Perez's clothing did not reveal any of the victim's blood. The blood found on the clothing was either Guzman-Perez's or belonged to a female. All items were eventually returned to Guzman-Perez's family. Luann Kitheart, the Tama County jailer, testified that the booking sheet listed all items taken from Guzman-Perez, including the sweatshirt, but that all items taken from Guzman-Perez and not tested by the DCI were released to Guzman-Perez and his father, including the striped sweatshirt. Guzman-Perez's father claimed he did not get the striped sweatshirt.

Guzman-Perez filed a PCR petition, asserting counsel was ineffective in the following respects: (1) failure to obtain the striped sweatshirt and examine it for the victim's DNA or request a spoliation instruction because of its destruction; (2) failure to object to the jury instructions relating to the inference of malice aforethought from the use of a deadly weapon; (3) failure to use an expert witness to testify as to the unreliability of eye witness testimony and as to various

other factual issues; (4) failure to effectively cross-examine State's witnesses on the location of the witnesses, the existing light at the scene, and the timeline of the events; (5) failure to investigate lay witnesses present at the scene supporting his claim of accident; and (6) failure to employ a crime scene reconstructionist. He then asserts that these deficiencies when added together warrant a new trial.

### III.    Error Preservation

An exception to the traditional error preservation exists when the claim is ineffective assistance of counsel. *State v. Fountain*, 786 N.W.2d 260, 262-63 (Iowa 2010).

### IV.    Standard of Review

Appeals from the district court decision denying a request for postconviction relief are ordinarily reviewed for corrections of errors at law, but when a constitutional issue such as a claim of ineffective assistance of counsel is involved, it is reviewed de novo. *Lemasters v. State*, 821 N.W.2d 856, 862 (Iowa 2012).

### V.    Merits

To prevail on a claim of ineffective assistance of counsel, the claimant must prove by a preponderance of the evidence that: (1) counsel failed to perform an essential duty and (2) prejudice resulted. *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001). A claim of ineffective assistance must overcome the presumption that counsel is competent. *Taylor v. State*, 352 N.W.2d 683, 685 (Iowa 1984). An accused is not entitled to perfect representation but only that level of representation that is within the normal range of competency. *State*

*v. Artzer*, 609 N.W.2d 526, 531 (Iowa 2000). Strategic choices made after proper investigation are virtually unassailable. *Ledezma*, 626 N.W.2d at 143. In reviewing counsel's effectiveness, we do not take on the role of a Monday morning quarterback and view the decisions with 20/20 hindsight. *Fryer v. State*, 325 N.W.2d 400, 414 (Iowa 1982). For relief to be granted, there must be a determination that, but for ineffective assistance, there is a reasonable probability that the result would have been different. *Ledezma*, 626 N.W.2d at 145. Counsel is not ineffective for failing to make a meritless claim. *State v. Brubaker*, 805 N.W.2d 164, 171 (Iowa 2011). We will consider the claims of ineffective assistance of counsel issue by issue.

###### **A.** *The Striped Shirt*

Guzman-Perez places importance on the striped sweatshirt because it could have had blood on it that might indicate the victim was shot at very close range, consistent with Guzman-Perez's "accident" testimony. The testimony of Kitheart, the Tama County jailer, was that everything seized was turned over to the DCI and those items not seized were turned over to Guzman-Perez's father. She further testified that if the sweatshirt had blood stains on it, she would have retained it and turned it over to the DCI. She testified that a murder is unusual in Tama County, she specifically remembers the striped sweatshirt, and it did not have any blood stains on it. There was, in fact, no testimony from Guzman-Perez or any witnesses that the sweatshirt had blood on it. Guzman-Perez was wearing his pea coat over his shirt, and the coat was turned over to the DCI. Wohlman's blood was not found on any of the Guzman-Perez clothing turned over to the DCI. Guzman-Perez did not advise his trial counsel that the

sweatshirt had blood on it, and there was no proof that it did. Counsel testified that if he had been told there was blood on the sweatshirt, he would have made every effort to find it.

Guzman-Perez asserts that because of the absence of the sweatshirt, the jury should have been given an instruction allowing it to conclude that if the sweatshirt had been produced, it would have been favorable to him and unfavorable to the State. See *State v. Langlet*, 283 N.W.2d 330, 333 (Iowa 1979). In order to give such an instruction, there must be substantial evidence that: (1) the item (sweatshirt) was in evidence; (2) the evidence was in the possession of or under the control of the State; (3) the evidence would have been admissible; and (4) the party responsible for its destruction did so intentionally. *See State v. Hartsfield*, 681 N.W.2d 626, 631 (Iowa 2004).

The trial court considered the credibility of the witnesses and determined the sweatshirt had been turned over to Guzman-Perez's father on December 18, 2007. There was no evidence the State intentionally destroyed it or that it contained any relevant evidence. Counsel did not have a duty to request a spoliation instruction because the facts fell far short from permitting one. The sweatshirt appears to be a Guzman-Perez afterthought, and trial counsel had no reason to think it had any evidentiary value. Counsel did not have a duty to investigate its location.

**B.** *Malice Aforethought Instruction*

It was necessary for the jury to find that Guzman-Perez acted with malice aforethought in order to find he was guilty of second-degree murder. *See* Iowa Code § 707.1—.3 (2005). The jury was instructed that:

"Malice" is a state of mind which leads one to intentionally do a wrongful act to the injury of another out of actual hatred or with an evil or unlawful purpose. Malice may be established by evidence of actual hatred or by proof of a deliberate intent to do injury. Malice may be found from the acts and conduct of the defendant and the means used in doing the wrongful and injurious act.

"Malice aforethought" is a fixed purpose or design to do some physical harm to another which exists before the act is committed. It does not have to exist for any particular length of time.

Malice aforethought may be inferred from the defendant's use of a dangerous weapon.

Guzman-Perez's trial counsel did not object to the instruction, which is a verbatim rendition of the uniform instruction. Guzman-Perez contended that counsel should have requested an additional instruction stating as follows:

Malice aforethought may be but does not have to be inferred from the use of a dangerous weapon in the absence of evidence to the contrary. This inference may be rebutted by evidence showing the killing was accidental, under provocation, or because of mental incapacity.

The instruction used by the trial court was requested by both parties. It is a correct statement of law, *see State v. Ambrose*, 861 N.W.2d 550, 559 (Iowa 2015), and Guzman-Perez still does not contend otherwise. The instruction used only permits the jury to infer malice aforethought from the use of a dangerous weapon. The language used does not instruct the jury that they are required to make such an inference. Guzman-Perez's counsel emphasized the permissive nature of the inference in argument. The jury was also instructed that Guzman-Perez must have been aware of doing the act and acted voluntarily, and that means his actions were not by mistake or accident.

Inference instructions, such as the one used in *Ambrose,* should be used with care. *Id* at 560. *Ambrose* sets out a hypothetical where one of two parties is

in a fight and picks up a rock and kills another and questions the applicability of the inference instruction in such a case. *Id.* We are a far cry from the hypothetical set out in *Ambrose.* Guzman-Perez made threats to kill, brought the gun with him to the party, and had the gun in his possession. The gun was loaded, and he successfully resisted an attempt to have the gun taken from him. The use of the inference instruction here presents less of a question than of its use in a recently decided case. *See State v. Green*, 896 N.W.2d 770, 781 (Iowa 2017). In the *Green* case, there was no evidence of threats, the dangerous weapon was a baseball bat, and there was no evidence the perpetrator had brought the bat to the altercation. *Id.* A uniform instruction was used, and normally, we are slow to disapprove of uniform instructions. *Ambrose*, 861 N.W.2d at 560.

Our objective when reviewing a trial court's instruction is not to determine if some other instruction would have been preferable but whether the instruction actually given accurately portrayed the applicable law to the jury. *State v. Bousman*, 276 N.W.2d 421, 422 (Iowa 1979). Counsel had no duty to object to the inference instruction used.

**C.** *Failure to Retain Expert Witnesses*

1. Effect of Alcohol on Perception

It appears that all but one of the witnesses to the incident had been drinking alcoholic beverages. This includes Guzman-Perez, those witnesses that testified on his behalf, and those witnesses he says counsel should have called. Wagg was the only witness that said she had not been drinking, and her testimony was prejudicial to Guzman-Perez. Counsel believed that the effects of

alcohol on one's perception would be well known to the jury, in any event and an expert's testimony would have not been helpful to the jury or to Guzman-Perez.

2.    Crime Scene Reconstructionist

In the PCR proceeding, Guzman-Perez called a forensic reconstructionist, Wayne Hill Sr.  Hill basically concurred with the State's witness, Murillo, and the testimony of the associate State medical examiner.  Neither Dr. Hill nor Murillo were able to determine whether Wohlman was standing, crouching, or on the ground when he was shot.  The testimony of Murillo was effectively used by Guzman-Perez's counsel to buttress his claim of an accident.  Dr. Hill emphasized the stippling that showed a close shot but was unable to say that the stitching or the attempted stitching could not be confused with stippling.

3.    Lighting Expert

There is no reason to think that a lighting study would have been of any assistance to Guzman-Perez.  The State had done a lighting study of the area in the belief it would have assisted the prosecution by buttressing the testimony of the State's eye witnesses.  Guzman-Perez's counsel also determined it would have been helpful to the State and successfully objected to the testimony, and it was not permitted to come into evidence.

4.    An Expert on Eye Witness Testimony and Memory Lapses

Guzman-Perez and witnesses he called to testify are subject to the same eye witness impairments and memory lapses as are the State's witnesses.  The testimony would have been of little or no value to Guzman-Perez.

5. Firearms Expert

Guzman-Perez's expert in the post-trial hearing assumed, if the incident had happened as related by the State's witnesses, then Wohlman would have had time to assume a defensive position, which in his opinion is inconsistent with the almost-level trajectory of the bullet after entering Wohlman's forehead. The expert testified, in essence, that Guzman-Perez may have involuntarily pulled the trigger as a reflex to the tackling by Wohlman. Guzman-Perez had a relatively small revolver, and there is no evidence that a probably drunk Wohlman knew Guzman-Perez had a real gun or was in fact intending to use it and could process what was happening. There was consistency among all the witnesses of both the prosecution and the defense that the events all happened very quickly.

6. Guzman-Perez's Uncalled Witnesses

Some of the witnesses that Guzman-Perez contends should have been called were friends of Guzman-Perez, and at least one was a cousin. Their rendition of the events at the PCR hearing was effectively and repeatedly impeached by prior inconsistent statements they had made to the investigator immediately after the incident and some statements that had been made later in depositions. Their testimony at the PCR hearing was primarily to the effect that Guzman-Perez had not been involved in the fight before the shooting. This PCR testimony would have been more helpful to defeat the issue of premeditation required if a first-degree-murder verdict had been returned. There was substantial agreement among the witnesses that Wohlman had tackled Guzman-Perez from the front prior to the shooting and that someone had attacked Guzman-Perez from behind. That in itself would qualify as adversarial physical

conduct or fighting. Each witness to the shooting called by Guzman-Perez in the PCR hearing testified that Guzman-Perez had been tackled by Wohlman.

In each case where Guzman-Perez now claims that an expert would have been helpful, trial court counsel testified they had considered the use of an expert but decided against it for one reason or another. Trial counsel also considered calling more of Guzman-Perez's friends as witnesses but in each case decided they would be consistently impeached, as they were in the PCR hearing. Counsel testified that in each case, determinations were made as a matter of strategy and Guzman-Perez agreed with the decision of counsel regarding the use of an expert or the defendant's witnesses at the time of each trial. We determine Guzman-Perez has not shown he received ineffective assistance due to counsel's failure to call expert witnesses.

**D.** *Ineffective Cross-Examination*

Guzman-Perez asserts that counsel did not effectively cross-examine the State's witnesses. Specifically, he asserts there were inconsistent statements made either in previous statements or depositions of the State's witnesses that were not brought out by counsel. Counsel was able to discredit each of the State witnesses to the crime by use of prior contradictory statements either when they were deposed or when the investigation took place. Not every inconsistent statement was pointed out, but counsel testified that in their experience, there is a point after which such an approach becomes counterproductive. The trial court concluded "that the quality of preparation and the cross-examination conducted by trial counsel far exceeded any minimum threshold of competency." We agree.

**E.**     *Cumulative Errors*

In order to rely on the concept of cumulative error in an ineffective-assistance claim, the petitioner must establish that at least one of the claims presented created an instance where counsel failed to exercise an essential duty.  In that event, the cumulative error can be considered to establish prejudice.  *State v. Clay*, 824 N.W.2d 488, 501 (Iowa 2012).  We have failed to find any instance where counsel failed to perform an essential duty.  Therefore the concept of cumulative effect is not applicable.  *See id.*  Finally, if counsel failed any duties so that the cumulative effect of prejudice could be considered, we find no probability the result would have been different.  The evidence against Guzman-Perez was overwhelming.

**VI.     Ineffective Assistance of Appellate Counsel**

Appellate counsel on the direct appeal asked to withdraw and requested the appeal be dismissed as a frivolous appeal.  The supreme court sent the matter back to the trial court to have a new trial determination based on the weight-of-the-evidence standard.  Guzman-Perez asserts the appeal should have been pursued more vigorously but fails to be more specific.  It is not enough to simply complain counsel should have done a better job.  *Dunbar v. State*, 515 N.W.2d 12, 15 (1994).

To the extent that Guzman-Perez attacks the credibility of the witnesses, credibility is a matter for the jury to decide.  *Gail v. Clark*, 410 N.W.2d 662, 671 (Iowa 1987).  We believe that to the extent Guzman-Perez has raised legal issues, they are encompassed within our ruling on this appeal.

The denial of postconviction relief is affirmed.

**AFFIRMED.**